676 A.2d 1009

**William Robert FAGAN, Sr.**

v.

**STATE of Maryland.**

**No. 1126, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

May 30, 1996.

Reconsideration Denied June 25, 1996.

Martha Weisheit, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for Appellant.

Tarra DeShields–Minnis, Asst. Atty. Gen., Baltimore (J. Joseph Curran, Jr., Atty. Gen., Baltimore, Andrew L. Sonner, State's Atty. for Montgomery County, Rockville, on the brief), for Appellee.

Argued before WILNER, C.J., and WENNER and EYLER, JJ.

WENNER, Judge.

Appellant, William Robert Fagan, Sr., was convicted by a jury in the Circuit Court for Montgomery County [1] of conspiracy to commit first degree murder.[2] After appellant's motion for a new trial had been denied and he had been sentenced to life in prison, he noted this appeal, in which he poses a tetrad of questions, which we have rephrased slightly for clarity:

I. Did the trial judge usurp the fact-finding function of the jury when, in response to a jury question about corroboration of accomplice testimony, the trial judge gave the jury specific examples of corroboration from the evidence presented in the case?

II. Was the evidence insufficient to corroborate the testimony of appellant's alleged accomplice?

---

1. Appellant was first tried in Frederick County. That trial ended in a mistrial. Although the same judge presided, the retrial was moved to Montgomery County.

2. Appellant was acquitted of first and second degree murder.

III. Did the trial judge err in permitting the jury to determine whether Allan Phillips was an accomplice?

IV. Did the trial judge err in improperly restricting appellant's cross-examination of Allan Phillips?

We shall answer appellant's first question in the affirmative and, on that basis, reverse the judgment of the circuit court and remand the case to that court for a new trial. Hence, we need not address appellant's remaining questions.

## Facts

The body of appellant's wife, Deborah Patricia Fagan, was discovered at about 8:20 on the morning of 6 January 1992, in the driver's seat of a blood-spattered vehicle parked on Ashcroft Terrace [3]. She had died of two gunshot wounds to the head, both fired at close range.

Trooper Rick Stotelmyer, a crime scene technician for the Maryland State Police, was dispatched to the murder scene to collect evidence. On arriving at the murder scene, Trooper Stotelmyer photographed a number of blood smears on both the victim and the vehicle, dusted for fingerprints, and gathered hairs and fibers from the front passenger seat. Employing a metal detector, Trooper Stotelmyer recovered a bullet jacket from a grassy area just off Ashcroft Terrace.

Nothing in the back seat of the vehicle appeared to have been disturbed. Upon examining the contents of the victim's purse, a check for $150.00 was found, signed by the victim and made payable to appellant. A notation on the check indicated it to have been intended for the Internal Revenue Service.

On cross-examination, Trooper Stotelmyer testified that anyone in the vehicle when the fatal shots were fired would have been spattered with blood. Moreover, the trooper opined that the blood had been smeared by whoever was in

---

3. Ashcroft Terrace is a paved roadway in a planned development in the Monrovia area of Frederick County, near the intersection of Gladhill Brothers Road and Kemptown Church Road. At the time the victim was killed, no houses had yet been constructed on Ashcroft Terrace.

the vehicle when the victim was killed. Trooper Stotelmyer also opined that the victim had been killed while in the vehicle at Ashcroft Terrace, and that the perpetrator had fled either on foot or by vehicle.

Joseph Kopera was presented by the State as an expert on ballistics and firearms. Kopera testified that the bullet jacket found by Trooper Stotelmyer was part of a .38/.357 caliber bullet.[4] According to Kopera, the bullet jacket could only have been fired from one of three brands of revolvers. One of those brands was a Smith & Wesson. Kopera further opined that the murder weapon had been fired from no more than twelve inches from the victim. Of the guns presented to him by the State, Kopera could not determine which, if any, of them had been used in the killing.

William Nicklas, a practicing attorney from Frederick, testified that the victim had consulted him in October of 1991 about obtaining a limited divorce from appellant. Nicklas said that he and the victim had met with appellant to discuss certain issues,[5] but that appellant became hostile and Nicklas had terminated the discussion.

The victim's mother, Patricia Kamman, testified that the victim and her two young children had moved in with her during late September of 1991 because of domestic problems. Ms. Kamman testified that, when she left for work on the morning of the murder, the victim was asleep. Ms. Kamman said that the victim normally left for work between 6:20 and 6:35 a.m.

The State also presented Kelly Appicello, the victim's sister, as a witness. Ms. Appicello testified that she was aware that appellant and the victim "weren't getting along" in September of 1991, and that the victim and her children had moved in with Ms. Kamman.[6]

---

4. Kopera explained that the diameter and weight of the component bullet for a .38 special and a .357 magnum are "exactly the same...."

5. At that time, appellant had no attorney.

6. Ms. Appicello and her family were also residing with Ms. Kamman.

Ms. Appicello recounted that the victim had been seeing one Anthony Fiorill, and that on 4 January 1992, two days before the murder, the victim and her children had spent the night at the Fiorill house. Ms. Appicello also testified that she had overheard a phone call during which appellant asked the victim "to meet him so she could give him a check for the IRS."

Ms. Appicello said that the victim had gotten up at about six o'clock on the morning of 6 January, the first day on which the victim was returning to work after the holidays. Ms. Appicello recalled that the victim had written the check for the IRS at about 6:20 a.m., and left for work in her own vehicle.[7]

Anthony Fiorill was also presented as a witness for the State. Fiorill related an encounter with appellant in August of 1991 at a neighborhood pool party. During their conversation, appellant told Fiorill that the victim was experiencing a problem with her pituitary gland. When Fiorill expressed his sympathy, appellant "made some crack about, 'That's okay. She has a good insurance policy.'"

According to Fiorill, the victim had begun visiting his home after she and appellant had separated in September of 1991. Allan Phillips, a close friend of appellant lived near Fiorill in Montgomery County, and Fiorill would often see appellant's vehicle parked in the vicinity. Fiorill described how on one occasion, upon leaving his house, the victim discovered that her car's tires had been deflated.

The victim was employed by Electronic Data Systems (EDS). One of her co-workers, Vicky Degraffenreid, testified that the victim had obtained an insurance form, used to designate beneficiaries, from the office. Another co-worker, Kathleen Kemp, testified that the victim talked about closing her joint bank accounts with appellant and opening an account in her own name. EDS's Office Manager, Trudy McKnight, detailed an August 1991 conversation in which the victim had

---

7. The victim had recently purchased a red/maroon Pontiac Grand Am, the vehicle in which she was found shot to death.

inquired of McKnight about the steps the victim needed to take in changing the beneficiary of her insurance. Ms. McKnight went on to say that, several days after the victim had been murdered, Ms. McKnight received a telephone call from a man who identified himself as appellant, inquiring of the steps necessary to collect the victim's life insurance.

Corporal Ted Nee, the investigating officer for the Frederick County Sheriff's Department, testified that he had visited appellant at home about 12:40 p.m. on the day of the murder. Corporal Nee said appellant had told him that, although he normally left for work about 6:00 a.m., on the day in question he had waited for the victim to deliver him a payment for the IRS by 6:30 a.m. Appellant also told Nee that, as the victim failed to arrive, he had gone on to work at about 6:45 a.m.

When Corporal Nee asked appellant if there were any weapons in the house, appellant said no, although he once kept a shotgun on the premises. According to appellant, the shotgun was no longer there because of the children.

After appellant consented to a search of the house, Corporal Nee observed two different brands of beer in appellant's refrigerator: Coors Light and Bud Light. Two days later, Nee found empty Coors Light and Bud Light cans near the crime scene.

While searching appellant's house, Nee retrieved appellant's work overalls, as well as a paint chip containing a red mark. Later, while executing a search warrant, Nee seized a kit for cleaning guns from appellant's basement, as well as a cigar box containing a .38 caliber shell casing. Nee said that appellant waived his *Miranda* rights,[8] and consented to a taped interview on the following day.

Nee conceded on cross-examination that tests performed on the paint chip as well as on a sweatshirt seized from appellant's residence had failed to reveal the presence of blood.

---

8. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Moreover, the animal hairs obtained from the vehicle in which the victim was found were not consistent with appellant's dogs.

State's witness Wayne Holl recalled a conversation with appellant during the summer of 1991 in which they had discussed weapons. Appellant had mentioned to Holl several weapons he had owned, including a .357 Smith & Wesson. Holl was later shown the Smith & Wesson.

Richard Howell, who had known appellant for almost twenty years, testified that in 1991 he had inquired of appellant about appellant's marriage. Howell smelled beer on appellant's breath as appellant responded that Tony Fiorill was ridiculing appellant in front of his children, and "[p]retty much in the same sentence [appellant] said that he was going to get a throw away, shoot the bitch and plant the gun on Tony to make it look as if he did it." Appellant's cousin, Robert Ivey, was present during this conversation. After the murder, Ivey accused appellant of the crime. According to Ivey, appellant thanked him for being "up front" or "honest."

Other evidence was adduced at trial relating to appellant's familiarity with and use of firearms. For example, Paul Marstaller testified that, during a visit with appellant around Christmas of 1991, appellant, in referring to the victim, said that "one bullet will take care of everything." Marstaller nevertheless admitted having said the same thing "a thousand times. I have been saying it for 20 years."

Another witness, William Stevens, described an incident that occurred after the murder, but before appellant was arrested. Allan Phillips' wife had telephoned Stevens, and asked him to tell appellant "[t]hat Mortichi Jones called. You better head west."

Allan Phillips [9] testified that he had used the name "Mortichi Jones" to warn appellant of developments in the investigation. Phillips also testified that, given his proximity to Anthony Fiorill's house, Phillips had kept appellant apprised of the

---

9. Pursuant to an agreement with the State, Phillips had earlier entered a plea of guilty to conspiracy to murder.

victim's visits. Phillips also confirmed that it was appellant who had deflated the victim's tires during one of her visits to Fiorill's house.

According to Phillips, appellant was not happy with these visits:

> **PHILLIPS:** [Appellant] commented several times that doing anything to either Wayne Holl or to Tony [Fiorill] that it wouldn't do any good because [the victim] would just move on to somebody else, that he would have to take care of her, do something to her to stop it, to stop—if he couldn't have her, nobody could.
>
> If [the victim] wouldn't come back home, he didn't want nobody else to have here [sic], and he would take care of the situation, do something or fix it so that he could have her and nobody else.

Phillips said that he and appellant had driven to the Kamman house just after Christmas, and while they were parked near the Kamman house, appellant "brought up the fact of what about here[?]" Phillips felt this to have indicated appellant's desire to "do some harm to [the victim]." At some point, the two had driven to Ashcroft Terrace, where appellant "mentioned what I [Phillips] thought about that area, what do you think about here?"

Phillips recalled responding, "well, it would be better to do it here, if you were going to kill her than if you were going to do [sic] over at her mother's house...." Phillips went on to say that the two had finished the Coors Light and Bud Light beers [10] they were drinking, and tossed the empty cans into the grass.

Phillips testified that appellant had later asked to be dropped off near the Kamman house on the morning of the murder, and Phillips had done so. When he picked appellant up that morning, Phillips said appellant was wearing "[a] plumber[']s hat, cap, like a baseball style, flannel shirt, either

---

10. It was Phillips' testimony that he [Phillips] drank Coors Light, and appellant consumed Bud Light.

corduroys or jeans and work boots," and was carrying "[a] pair of overalls, a vest, and like a black legal bag, something like a suitcase but like vinyl material."

After leaving appellant near the Kamman house, Phillips went on to work in Montgomery County, arriving at about 4:30 or 4:45 a.m. Phillips said he left work at about 6:30 that morning to go to NIH for treatment of a chronic skin disease. Appellant worked at NIH. According to Phillips, when he encountered appellant at NIH, they stepped outside for a cigarette, and appellant said, "It is all over with." Moreover, Phillips said he had agreed to keep some items for appellant in his vehicle until appellant retrieved them, which he had done some weeks later.[11]

Several witnesses remembered having seen a maroon or dark colored vehicle parked at the bottom of Ashcroft Terrace at about 6:40 to 7:00 on the morning of the murder. Another witness remembered seeing the headlights of a vehicle moving slowly on Gladhill Brothers Road at about 6:15 that morning.

As Christopher O'Neal was not available for the second trial, his testimony from the first trial was admitted into evidence, revealing that he owned a 1990 Pontiac Grand Am. On the morning of the murder, O'Neal recalled following a vehicle of the "same general type" on Gladhill Brothers Road. According to O'Neal, this vehicle turned onto Ashcroft Terrace sometime between 6:30 and 6:40 that morning.[12] At about 6:45 that morning, Megan Duffy saw her dog running towards

---

11. Although Phillips was uncertain what appellant had placed in Phillips' car because "they were wrapped up and folded up," Phillips testified "I think it was the jumpsuit ....," and/or possibly other items that "may have been used in killing [the victim]."

12. On cross-examination, defense counsel brought out that O'Neal had earlier told the police he thought the vehicle may have been silver or white. Nevertheless:

> O'NEAL: I think in further conversation, that it was—I came to say that I really couldn't tell what the color was, just because of headlight glare, and I said that after that, that it could have been—it could have been any color basically.

and barking at a slim man about six feet tall jogging in a sweatshirt with a grey hood.

Gary DeWitt testified that he nearly struck a jogger as he entered Gladhill Brothers Road while leaving for work between 6:45 and 6:50 on the morning of the murder. DeWitt described the jogger as a man of medium build and medium bulk, clad in blue pants, possibly a dark pullover sweater, perhaps canvas shoes, and a light-colored cap or hood.[13] DeWitt also said that the man may have been wearing a shirt under the sweater that was "plaid perhaps, I don't know," but was unable to see the jogger's face.

Appellant's supervisor, Timothy Haley, was the State's final witness. According to Haley, on the day of the murder, appellant did not arrive at work at his normal time, and when he finally arrived, appellant was not dressed in his usual coveralls and welder's cap. Rather, appellant was wearing a baseball cap, blue jeans, and a plaid flannel shirt.

Mark Gluck was called as a witness by the defense. On the day of the murder, Gluck had worked with appellant during the entire morning. Gluck said that appellant had arrived about 8:30 that morning. When defense counsel asked Gluck if Phillips had been with them on the day of the murder, Gluck responded, "That morning, I don't believe—I don't know. I don't remember if he did ... I don't recall seeing him, no." By stipulation, certain business records were then admitted into evidence, indicating that Phillips had been on sick leave during the entire week of 6 January.

Appellant testified in his own defense, and repeated that he had planned to obtain the IRS payment from the victim on the day in question, but that, as she had not arrived, he had proceeded to work, arriving at about 8:00 to 8:15 that morning.

---

**13.** DEWITT: I did get the impression that there was something—in the brief glance, that there was something light up top, which leads me to believe it was either a Caucasian or that the runner was wearing something light-colored on top of [his] head.

We shall add such further facts as may be necessary to our discussion.

## Discussion

During its deliberations, the jury sent the trial judge the following note:

> Some jurors would like the judge to define corroboration. Alternatively, how about a dictionary?

Out of the presence of the jury, the following colloquy ensued:

> THE STATE: I don't think the instruction could be a lot clear [sic] than that, Judge. I thought that the Court had pretty much defined corroboration in the instructions. Reading that back it seems to me that it is pretty clear.

> DEFENSE: We are in agreement. We don't think any further instruction should be given. I think that what Your Honor said was clear. It was an accurate statement of the law and it shouldn't be expanded upon.

> I think the appropriate response is to refer the jury to the instructions you previously gave by the, what do we call it, the tape.

As was her prerogative,[14] the trial judge considered recalling the jury to the courtroom:

> THE COURT: Well, I am assuming they are talking about corroboration of an accomplice [sic] testimony but of course I don't know that.

> Why don't we get them in here and see what the situation is.

Counsel repeated their concerns:

---

14. *See, e.g., Mitchell v. State,* 338 Md. 536, 540, 659 A.2d 1282 (1995) ("Under Maryland Rule 4-325(a), '[t]he decision to supplement [jury] instructions and the extent of supplementation are matters left to the sound discretion of the trial judge, whose decision will not be disturbed on appeal in the absence of a clear abuse of discretion' ") (quoting *Howard v. State,* 66 Md.App. 273, 284, 503 A.2d 739, *cert. denied,* 306 Md. 288, 508 A.2d 488 (1986)).

DEFENSE: I think—I don't think that is what we should do, Your Honor. I think Your Honor should send them back a note that says essentially what counsel had just stated.

I don't think we want to get into colloquy with the jury which can then result in some form of additional instructions being given that they may think are instructions or whatever.

THE STATE: Judge, it would concern me that we would have certainly [sic] discussions with the jury. Perhaps some jurors would then go back in the room and consider themselves vindicated and others would think that they were wrong.

I don't think the Court's instructions could have been any clearer. I don't see what the confusion is as to the definition of the word corroboration.

If that is the purpose for a dictionary I don't see how the Court could have done much more with that.

THE COURT: All right. Well, I think I am going to have them come in.

Have them come in.

DEFENSE: Just so the record is clear, we do object.

The trial judge addressed the jury after it had returned to the courtroom:

THE COURT: Good afternoon. Ladies and gentlemen, you did send me a note and ask me for further definitions of corroboration and also asked me if you could have a dictionary.

Of course, I declined to give you a dictionary and I would like to explain to you why: Because you are asked to base your decision solely on the evidence that has been admitted in this courtroom. That is why I cannot give you a dictionary, because there is not a dictionary in evidence.

Have you listened—and I will address my remarks to the foreperson—have you listened to the further instruction on the tape regarding corroboration?

FOREPERSON: Yes, we have.

THE COURT: All right, and does this question relate to corroboration of an accomplice's testimony?

FOREPERSON: Yes.

THE COURT: All right. Well, I think you could consider Mr. Phillips as an accomplice. Therefore, there should be some corroboration.

But even after listening to the instruction it is still not clear what corroboration is?

FOREPERSON: There are a few jurors for whom it is not clear.

THE COURT: All right. Well, ladies and gentlemen, I can tell you again what I had instructed you previously and that is ordinarily if you believe solely the testimony of a witness you could convict someone simply on the witness's testimony.

But when you have someone who is an accomplice that gives testimony then the law says because they are an accomplice, in other words they have engaged in some criminal activity, the law says then when you have an accomplice testifying you cannot convict a defendant solely on an accomplice's testimony unless it is corroborated.

Corroboration means there is some other evidence that would—aside from the accomplice's testimony that would also show that the defendant either committed the crime or that the defendant was with others who committed the crime at the time, place that the crime was committed. The law further instructs that this corroboration only need be slight, but some other evidence.

Does that make it a little bit clearer or do you wish me to give an example?

A JUROR: The word "slight."

THE COURT: The word "slight?" Well, the word "slight" essentially means any corroboration.

■ At this point, the presiding judge's supplemental instructions were appropriate. As the Court of Appeals reiter-

ated recently in *Grandison v. State,* 341 Md. 175, 670 A.2d 398 (1995):

> " 'Not much in the way of evidence corroborative of the accomplice's testimony has been required by our cases. We have, however, consistently held the view that while the corroborative evidence need not be sufficient in itself to convict, it must relate to material facts tending either (1) to identify the accused with the perpetrators of the crime or (2) to show the participation of the accused in the crime itself. *See Wright v. State,* 219 Md. 643, 150 A.2d 733 (1959). If with some degree of cogency the corroborative evidence tends to establish either of these matters, the trier of fact may credit the accomplice's testimony even with respect to matters as to which no corroboration was adduced. *McDowell v. State,* 231 Md. 205, 189 A.2d 611 (1963)....' "

*Grandison,* 341 Md. at 248, 670 A.2d 398 (quoting *Brown v. State,* 281 Md. 241, 378 A.2d 1104 (1977)).

Nonetheless, the colloquy continued:

A JUROR: I think an example may be helpful.

THE COURT: All right. Well, I fear giving you an example because of course you are the determiner of the facts. I want you to remember that if I give you an example. You determine what the facts are. It is not what I say. Because I say there is testimony regarding such and such does not mean that there is, because it is only what I remember. It is really your recollection that is important.

For example, some other evidence of an accomplice's testimony and that would be that [appellant] was the person who committed the crime.

I believe there was a Richard Pryor [15] testified to the best of my recollection that prior to the crime that [appellant]

---

15. There was no witness by that name. In his brief, appellant believes the trial judge was referring to the testimony of Richard Howell. Following our review of the record, we agree with appellant.

had something—had a conversation with him, and of course, it is up to you to determine what the nature of that conversation was, along the lines that the defendant said that he would "get a throwaway, shoot the bitch and then plant it on Tony."

**Now something like that would be an announcement before the crime of a plan to commit the crime, would be some corroboration. It might be in your mind, but meeting the definition of some corroboration of the fact that the defendant committed it.**

Another example might be, you remember certain testimony by Mr. DeWitt shortly after the crime occurred, testifying as to a jogger he saw in the roadway.

He described the clothing that the jogger had on as a plaid shirt and dark pants.[16] Then there was someone else at [appellant's] employment who said that when he came in that morning he had dark pants on and a plaid shirt.

**Now, that might be if you considered any of that to be true some corroboration that it could have been the defendant at the scene of the crime or someone around the time at the scene of the crime.**

So any other evidence, in essence, that would tend to indicate that it was the defendant that committed the crime will be considered corroboration of Mr. Phillips' testimony.

Now, as I said, I am very reluctant to give you these type of examples. It is solely up to you as to what evidence that you have.

Is that helpful? Do you have any other questions?

FOREPERSON: No.

THE COURT: All right, thank you.

---

16. According to appellant, DeWitt's testimony was uncertain as to what the jogger was wearing. He recalled seeing blue pants and a dark pullover sweater, but could say only that the shirt under the sweater was "plaid perhaps. I don't know" and that it was made of flannel.

FOREPERSON: Thank you very much.

THE COURT: I will excuse you to go back in the jury room.

Defense counsel immediately moved for a mistrial, on the grounds that the trial judge had "essentially directed a verdict for the State...." In the alternative, defense counsel requested that the trial judge recall the jurors, direct them to disregard the examples she had given them, and reinstruct the jury on "reasonable doubt." These motions were denied. In any event, in what appeared to be a "brief time," the jury returned with a verdict.[17]

Article 23 of the Maryland Declaration of Rights provides: In the trial of all criminal cases, the Jury shall be the Judges of Law, as well as of fact, except that the Court may pass upon the sufficiency of the evidence to sustain a conviction.

The Court of Appeals has interpreted the relevant provision of Article 23 to mean that the jury is "... the exclusive judge of the fact...." *Gore v. State,* 309 Md. 203, 210, 522 A.2d 1338 (1987). *See also Dykes v. State,* 319 Md. 206, 224, 571 A.2d 1251 (1990) ("Of course, what evidence to believe, what weight to be given it, and what facts flow from that evidence are for the jury, not the judge, to determine") (citing *Gore, supra*); *In re Petition for Writ of Prohibition,* 312 Md. 280, 318, 539 A.2d 664 (1988) ("[T]he provision, as we have construed it, basically protects the jury's right to judge the facts") (footnote omitted).

■ Moreover, "it is generally improper for a trial judge to show his or her opinion of those matters upon which the jury will eventually pass. The object of this rule is simply to prevent the court's opinion from influencing the verdict." *Gore,* 309 Md. at 214, 522 A.2d 1338. Quoting from *Dempsey v. State,* 277 Md. 134, 355 A.2d 455 (1976), the Gore court reiterated:

---

17. Defense counsel again moved unsuccessfully for a mistrial prior to the jury's returning to the court room with its verdict.

'. . . [I]t is undoubtedly true that a trial Judge, because of his high and authoritative position, should be exceedingly careful in any remarks made by him during the progress of a trial, either in passing upon evidence or ruling upon prayers, and should carefully refrain, either directly or indirectly, from giving expression to an opinion upon the existence or not of any fact, which should be left to the finding of the jury . . . .'

*Gore,* 309 Md. at 212, 522 A.2d 1338 (citations omitted).

Md. Rule 4–325(d) provides that "[i]n instructing the jury, the court may refer to or summarize the evidence in order to present clearly the issues to be decided. In that event, the court shall instruct the jury that it is the sole judge of the facts, the weight of the evidence, and the credibility of the witnesses."

Writing for the Court of Appeals in *Gore,* Judge Couch said that a supplemental instruction indirectly commenting on the general weight of the evidence constituted reversible error. *Gore,* 309 Md. at 214, 522 A.2d 1338. *Cf., Reynolds v. State,* 219 Md. 319, 326, 149 A.2d 774 (1959) ("[T]he weight of the evidence as well as the credit to be given to the witnesses are matters for the jury, and only the jury, to determine in a case where it is the trier of the facts") (citing former Rule 739 c; *Judy v. State,* 218 Md. 168, 146 A.2d 29 (1958)). Moreover, we believe what Judge Couch also recounted in *Gore,* to be "particularly appropriate here":

We are aware that it is sometimes difficult for the Court to assign reasons for its rulings without saying something that may unintentionally affect the jury. But if a judge makes a statement which shows his [or her] opinion of a question of fact which the jury is to pass on, it is very apt to make an impression on some, if not all, of the jurors and great care should be exercised to avoid it. · In this case, although it was doubtless unintentional on the part of the learned Judge who presided below, we are convinced that what he said was liable to influence the jury on an important question of fact, and hence it was error for him to make such a statement.

*Gore,* 309 Md. at 213, 522 A.2d 1338 (quoting *Coffin v. Brown,* 94 Md. 190, 202–03, 50 A. 567 (1901)).

■ To be sure, we are not unmindful that the trial judge couched her statements in cautionary language, and provided the jury with some, but not all, of the warnings required by Md. Rule 4–325. In fact, she closed her supplemental instructions by informing the jury that she was "... very reluctant to give ... these type of examples. It is solely up to you as to what evidence that you have."

Nonetheless, we conclude that in providing the jury with specific examples of corroboration from the evidence before it, the trial judge appeared to be favoring the testimony of certain witnesses over that of others, and commented on the general weight of the evidence.[18] Based on the record of this case, we are unable to declare the error harmless.[19] Consequently, we shall reverse the judgment and remand the case to the circuit court for a new trial.

**JUDGMENT REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR A NEW TRIAL.**

**COSTS TO BE PAID BY FREDERICK COUNTY.**

---

**18.** In fact, some of the trial judge's recollections of the evidence were incorrect.

**19.** The Court of Appeals has recently reiterated the harmless error standard:

[W]hen an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated.

*Hutchins v. State,* 339 Md. 466, 475–76, 663 A.2d 1281 (1995) (quoting *Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665 (1976)).