726 A.2d 786

**Bernard Gilbert ASHE**

v.

**STATE of Maryland.**

**No. 1225, Sept. Term, 1997.**

Court of Special Appeals of Maryland.

April 1, 1999.

538

Robert H. Harvey, Jr., Prince Frederick, for appellant.

Thomas K. Clancy, Asst. Atty. General (J. Joseph Curran, Jr., Atty. General, Baltimore, on the brief), for appellee.

Argued before DAVIS, KENNEY, and ROSALYN B. BELL (retired, specially assigned), JJ.

DAVIS, Judge.

A jury sitting in the Circuit Court for Charles County convicted appellant Bernard Gilbert Ashe of involuntary manslaughter and assault and battery. That same jury acquitted appellant of first degree felony murder, second degree specific intent murder, and conspiracy to commit mayhem, and deadlocked on charges of second degree depraved heart murder and conspiracy to commit assault and battery. On the final charge against appellant—first degree premeditated murder— the circuit court granted appellant's motion for acquittal.

Before the court (Clark, J.) sentenced appellant, the State re-tried appellant on the charges of second degree depraved heart murder and conspiracy to commit battery. A jury sitting in the Circuit Court for Prince George's County[1] convicted appellant of both charges, and appellant was sentenced to concurrent prison terms of twenty years and eighteen months. This timely appeal followed.

Appellant raises four questions, which we rephrase:

I. Did the second trial on charges of second degree depraved heart murder and conspiracy to commit battery violate appellant's double jeopardy rights?

II. Did the conviction of appellant for second degree depraved heart murder violate the rule against inconsistent verdicts?

III. Did the circuit court err when it refused to suppress a statement appellant made to the police?

---

1. Appellant requested that the second trial be removed from Charles County to Prince George's County because of extensive pre-trial publicity. We do not believe the motion for a change of venue served as a waiver of appellant's ability to challenge the second prosecution. Arguing that double jeopardy foreclosed a second trial on the second degree murder charge, appellant preserved the issue by filing a motion to dismiss on February 27, 1997, prior to the motion for a change in venue.

IV. Did comments made by the circuit court during jury instructions constitute reversible error?

We answer all questions presented in the negative and affirm the judgment of the circuit court.

## FACTS

This case stems from the murder of Paul Scott Jefferson (the victim) on June 27, 1996. On that date, the victim, several members of his family, and several friends returned to his home in Charles County after an excursion to an amusement park in Virginia. As they were exiting their car, a group of men approached and demanded to speak with the victim's brother, David, about racial slurs that David had allegedly made earlier in the week. David Jefferson refused to comply with their demands, so the group began to attack those who had been in the car. All of the family members and friends managed to escape to the house except the victim, who found himself surrounded. The group of men then proceeded to beat the victim to death.

Appellant was allegedly a member of the mob which attacked the victim. Two days after the attack, two detectives from the Charles County Sheriff's Department visited appellant's house, and asked him to accompany them back to their station house. Appellant complied with their request, and, during an interrogation at the station house, gave a statement implicating himself in the attack on the victim.

Appellant was subsequently charged and tried before a jury which, on February 21, 1997, convicted him of involuntary manslaughter and assault and battery. The jury also deadlocked on both second degree depraved heart murder and conspiracy to commit assault and battery and acquitted of first degree felony murder, second degree specific intent murder, and conspiracy to commit mayhem. A February 24, 1997 order of the court reflects that the State indicated an intent to re-try appellant on the charges for which the jury was hung. Thus, the State filed a motion, on March 10, 1997, to continue sentencing and to set a date for the re-trial. Despite appel-

lant's opposition, the court, in an order dated March 26, 1997, granted the motion.

Citing double jeopardy violations, appellant filed a motion to dismiss the second degree depraved heart murder charge. After the motion was denied by the trial court, appellant noted an appeal and moved for a stay of the re-trial pending the appeal. On April 23, 1997, the court denied the motion for a stay of the proceedings. The Administrative Judge for Charles County (McKee, III, J.), however, granted appellant's motion for removal and transfer of the case to Prince George's County, wherein a trial date was set for June 10, 1997. At the conclusion of trial, on June 13, 1997, the jury convicted appellant of second degree depraved heart murder and conspiracy to commit battery.

On July 22, 1997, appellant was sentenced to twenty years imprisonment for the second degree murder charge, into which the court merged the involuntary manslaughter and assault and battery convictions. On the conspiracy conviction, the court sentenced appellant to eighteen months imprisonment to run concurrently with the term for second degree murder.

Appellant timely noted this appeal on August 18, 1997. Additional facts will be set forth in the discussion of the issues.

## DISCUSSION

### I

■ Appellant first argues that, because of his initial conviction for involuntary manslaughter, his second prosecution for second degree depraved heart murder was barred by principles of double jeopardy. We disagree. Before addressing appellant's specific arguments, however, we shall set forth the double jeopardy principles applicable to the instant case. The Double Jeopardy Clause provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb...." U.S. CONST. amend. V. The amendment affords three basic protections to criminal defendants: "[It]

protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *Brown v. Ohio,* 432 U.S. 161, 165, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977).

Following a mistrial, a second trial is not prohibited by any of the three aforementioned protections because a mistrial is equivalent to a reversal of conviction on appeal. *See Wooten–Bey v. State,* 308 Md. 534, 542, 520 A.2d 1090, *cert. denied,* 481 U.S. 1057, 107 S.Ct. 2199, 95 L.Ed.2d 853 (1987). Although re-trial after a mistrial is essentially a second prosecution for the same offense, the policy behind double jeopardy does not require prohibition of the second prosecution. *See Jeffers v. United States,* 432 U.S. 137, 152, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977). If a jury is unable to agree on a verdict, the jeopardy which attached when the jury was sworn is dissipated by the declaration of a mistrial and a defendant is not relieved from further liability. *See Wooten– Bey,* 308 Md. at 543, 520 A.2d 1090 (quoting *Neal v. State,* 272 Md. 323, 327, 322 A.2d 887 (1974)). The Supreme Court opined:

> [W]e reaffirm the proposition that a trial court's declaration of a mistrial following a hung jury is not an event that terminates the original jeopardy to which petitioner was subjected. The Government, like [appellant], is entitled to resolution of the case by verdict from the jury, and jeopardy does not terminate when the jury is discharged because it is unable to agree.

*Richardson v. United States,* 468 U.S. 317, 326, 104 S.Ct. 3081, 82 L.Ed.2d 242 (1984).

In the instant case, the jury's inability to agree on the charge of second degree depraved heart murder did not prohibit the State from re-trying appellant, even though he was convicted of two counts, including involuntary manslaughter. In *State v. Griffiths,* 338 Md. 485, 659 A.2d 876 (1995), the appellant was convicted, *inter alia,* of possession of cocaine, although the jury was unable to reach a verdict on the

charge of possession of cocaine with intent to distribute as well as one other count. After the trial court declared a mistrial as to those counts, the appellant was sentenced on the counts for which he was convicted. Subsequent to the sentencing,[2] the State retried the appellant on the two counts for which the jury hung, and a guilty verdict resulted.

The Court observed that a hung jury is the "prototypical example" of manifest necessity for a mistrial that would allow re-trial for the same charge without offending double jeopardy principles. *See id.* at 490, 659 A.2d 876 (citing *Oregon v. Kennedy,* 456 U.S. 667, 672, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982)). The Supreme Court held, "jeopardy is not regarded as having come to an end so as to bar a second trial in those cases where 'unforeseeable circumstances . . . arise during the first trial making its completion impossible, such as the failure of a jury to agree on a verdict.'" *Green v. United States,* 355 U.S. 184, 188, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957) (quoting *Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 93 L.Ed. 974 (1949)). Thus, the trial court did not err by allowing a re-trial on the charges which caused the mistrial. Moreover, the fact that the defendant was sentenced prior to the re-trial is of no moment in the case *sub judice* because the court continued sentencing after the first trial so that appellant could be re-tried before sentencing.

Turning to appellant's specific argument, he asserts that his re-trial was barred by double jeopardy because of the collateral estoppel aspect of double jeopardy law. Under those principles, collateral estoppel precludes subsequently relitigating an "ultimate issue of fact" against the same defendant once that issue of ultimate fact has been fully and finally

---

2. We note that the sentencing issue present in *Griffiths* did not arise in the instant case because the court continued sentencing to allow for the re-trial to occur first. Therefore, we need not address the concerns proffered by the dissent in *Griffiths* that a court may not vacate the sentence from the earlier trial to avoid the multiple punishment that would occur by sentencing the defendant on the convictions in the second trial. *See Griffiths,* 338 Md. at 497, 659 A.2d 876 (Eldridge, J., dissenting).

determined in his or her favor in an earlier case. *Ashe v. Swenson,* 397 U.S. 436, 443, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970).

According to appellant, the initial conviction for involuntary manslaughter precluded his second prosecution for second degree depraved heart murder because of the element of malice. Appellant points out that malice is an element of second degree depraved heart murder, while it is not an element of involuntary manslaughter. Thus, appellant argues, a conviction for involuntary manslaughter is necessarily a finding that a defendant killed without malice, and prevents a subsequent prosecution for second degree depraved heart murder which, of course, requires a finding that the defendant did kill with malice.

■ Appellant's argument fails because it ignores the fact that there are two types of involuntary manslaughter—unlawful act involuntary manslaughter and gross negligence involuntary manslaughter—and that the second of these types differs only slightly from second degree depraved heart murder. Unlawful act involuntary manslaughter is defined as the killing of another unintentionally while doing some unlawful act. *See Schlossman v. State,* 105 Md.App. 277, 288, 659 A.2d 371 (1995), *cert. dismissed,* 342 Md. 403, 676 A.2d 513 (1996); *see also* Maryland Criminal Pattern Jury Instructions (MCPJI) 4:17.8 (1997). Gross negligence involuntary manslaughter, by contrast, is the unintentional killing of another while engaged in an otherwise lawful act in a grossly negligent manner. *See Williams v. State,* 100 Md.App. 468, 483–84, 641 A.2d 990 (1994). Finally, second degree depraved heart murder is virtually identical to gross negligence involuntary manslaughter. The only difference is that depraved heart murder has a heightened *mens rea*— instead of having acted in a grossly negligent manner, a defendant must have acted with "extreme disregard of the life[-]endangering consequences" of his actions. *Williams,* 100 Md.App. at 484, 641 A.2d 990 (citing MCPJI 4:17.8). This heightened disregard for human life takes the killing out of the realm of manslaughter and places it

within the more serious realm of murder. *See id.* at 484–85, 641 A.2d 990.

In this case, appellant was charged with unlawful act involuntary manslaughter. Thus, by convicting him of that offense, the jury in the initial prosecution found that he had unintentionally caused the victim's death while engaged in an unlawful act. These findings certainly did not involve any conclusion that appellant had not unintentionally caused the death of Paul Scott Jefferson while acting with extreme disregard for the life-endangering consequences of his actions.

■ Stated otherwise, collateral estoppel is only implicated when there is either an express factual finding or a factual finding necessarily implied by virtue of the ultimate determination of the fact finder, i.e., an acquittal of a bank robber for the robbery of teller "A" precludes a subsequent prosecution of the defendant for robbing bank teller "B" during the same criminal event because the criminal agency of the sole robber has been adjudicated at the first trial. *See Ashe v. Swenson, supra.* Whether the fact finder determines that an element of an offense has been proven or, inferentially, the existence, *vel non,* of a fact sought to be established, collateral estoppel requires that such determination be affirmative.

■ Thus, in the case at hand, re-prosecution would only be precluded if the initial jury had made an affirmative finding that malice did not exist. The failure of all twelve jurors to find that malice existed which resulted in a hung jury did not constitute an affirmative finding that malice did not exist. By analogy a jury conviction for day-time housebreaking rather than common law burglary implies only a non-finding of nighttime, not an affirmative finding of day-time. Reduced to its simplest terms, the mere doubt or inability to agree as to the establishment of element "A" is not proof of the absence of "A." Accordingly, the involuntary manslaughter conviction did not preclude the State from subsequently trying appellant for second degree depraved heart murder.

## II

 Appellant also argues that the conviction for involuntary manslaughter was inconsistent with the conviction for second degree depraved heart murder. Again, we disagree.

 A finding of inconsistency requires that the two convictions have elements that are incompatible with each other. As the above discussion demonstrates, however, the elements of unlawful act involuntary manslaughter and second degree depraved heart murder are entirely compatible.[3] Unlawful act involuntary manslaughter involves an unintentional killing of another while engaged in an unlawful act. *See Schlossman,* 105 Md.App. at 288, 659 A.2d 371. Second degree depraved heart murder involves an unintentional killing of another while engaged in extremely risky behavior, and in a manner that disregards, in the extreme, the life-endangering consequences of that conduct. *See Williams,* 100 Md.App. at 484, 641 A.2d 990. Accordingly, appellant's argument is without merit.

## III

Prior to his arrest, appellant was brought to a police station by two detectives of the Charles County Sheriff's Department. At no time during that visit did any member of the police force give appellant warnings, pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Nevertheless, while at the station house, appellant made a statement implicating himself in the murder.

---

3. Given that the only difference between gross negligence involuntary manslaughter and second degree depraved heart murder is the heightened *mens rea* of second degree depraved heart murder, those two offenses are not incompatible either. Indeed, involuntary manslaughter is a lesser-included offense of second degree depraved heart murder. *See Williams,* 100 Md.App. at 482–85, 641 A.2d 990 (explaining that reckless endangerment, gross negligence involuntary manslaughter, and second degree depraved heart murder are all related offenses, and that reckless endangerment will merge into involuntary manslaughter or second degree depraved heart murder upon a conviction for either involuntary manslaughter or second degree depraved heart murder).

Prior to trial, appellant moved to suppress that incriminating statement on the ground that his *Miranda* rights had been violated. The circuit court denied the motion. Appellant now argues that the circuit court erred by admitting the statement. We disagree.

Appellant's argument is based on the requirement that *Miranda* warnings be given to a person subject to "custodial interrogation" by the police. *See Miranda,* 384 U.S. at 444, 86 S.Ct. 1602. According to appellant, he was in "custody" when he made his incriminating statement, and should have been informed of his *Miranda* rights. Because the police failed to give him a *Miranda* warning, he argues, his statement was obtained in violation of his rights, and should have been suppressed.

 Whether appellant was in "custody" when he made his incriminating statement is a legal question, which we decide *de novo* using the facts found by the circuit court. *See McAvoy v. State,* 314 Md. 509, 515, 551 A.2d 875 (1989) ("Armed with the facts properly found by the trial judge, we must . . . make an independent constitutional appraisal of the record to determine the correctness of the trial judge's decision concerning custody."). Those facts, which appellant fails to challenge on appeal, were set forth by the circuit court as follows:

At approximately 10:45, on the morning of the 29th of June, 1996, Detective Goldsmith responded to [appellant's] residence in LaPlata. I specifically do not accept the testimony of [appellant] or his father that this occurred at 7:30 in the morning, which was their testimony. I accept the testimony which was supported by the record of the Sheriff's Department, that the initial contact on the 29th day of June 1996, with [appellant], occurred at approximately 10:45 a.m.

The officers were greeted at the [appellant's] residence by [appellant's] father. They told [appellant's] father that his son had witnessed an assault which occurred the previous day. They told [appellant's] father that his son wasn't a

suspect in that. That, in fact was not the case. They didn't know, at that point, whether he was a suspect or not a suspect, according to their testimony. According to the information that would have been in the knowledge of the police officers, it would be my opinion that they, in fact, knew that [appellant] was a suspect, but as the Supreme Court points out, that is not particularly relevant, especially since they never communicated to [appellant] that they believed that he was a suspect.

They asked [appellant] whether he would accompany them to the sheriff's department. [Appellant] agreed to do that. They drove to the sheriff's department. It took them about three or four minutes. When they were at the sheriff's department, [appellant] was polite and cooperative with them. That [appellant] was not advised of his *Miranda* warnings [sic].

Once they got in the police car, [appellant] was told by Detective Gibson that he was not under arrest and that he would be free to go at any time. [Appellant] said that he interpreted that as he would be free to go as soon as he gave a statement. It is my opinion that, it is my finding that that was never told to him by members of the sheriff's department, and there is nothing in the evidence from which I would find that a reasonable person in [appellant's] position would have understood that he was only free to go after he made a statement.

[Appellant] did, in fact, upon going to the sheriff's department, go to an interview room. He was interviewed by one officer. The other officer, Officer Goldsmith, was in a cubicle, the next cubicle from the one he was being interviewed in. There were other police officers there. The police officers held [appellant] in this room. [Appellant] made a statement which subsequently was reduced to written form. The statement was concluded at 12:21 in the afternoon, approximately, an hour and a half was the total time of this detention.

It is my opinion, that considering the totality of the facts and circumstances, that the statement was given by [appel-

lant] when he was not in custody. There is testimony in the case which I do not accept, that [appellant] said he requested a lawyer, or should I have an attorney present? [Appellant] says that Officer Gibson's reply to that was, that is up to you. And I do not accept that testimony, or that that statement, was ever made by [appellant], or that Detective Gibson told [appellant] that.

It is my finding that the statement given by [appellant] was not given while he was in custody. That [appellant] was at all times free to go. That he knew he was free to go. That he gave the statement freely and voluntarily. That he never requested to leave or requested an attorney, as he has indicated that he did.

Whether an individual is in custody for the purpose of giving *Miranda* warnings " 'depends on the objective circumstances of the interrogation, [and] not on the subjective views harbored by either the interrogating officers or the person being questioned.' " *Gantt v. State*, 109 Md.App. 590, 595, 675 A.2d 581 (1996) (quoting *Stansbury v. California*, 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994)). The relevant inquiry is whether a reasonable man in the suspect's position would have understood himself to be without the freedom to leave. *See McAvoy v. State*, 314 Md. at 516, 551 A.2d 875 ("A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.") (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)).

Here, when the police had appellant accompany them to the station, they informed him that he was not under arrest, and that he was free to go at any time. In light of these factual findings (and in spite of the fact that the questioning took place in a police station, while appellant was surrounded by police officers), we believe that a reasonable man in appellant's position would have understood that he was not under arrest, and that he was free to leave at any time. According-

ly, appellant was not in "custody" when he made the incriminating statement, and the statement was admissible at trial.

## IV

During its instructions to the jury, the circuit court informed the jury that it had an obligation, in evaluating appellant's incriminating statement,[4] to determine whether the statement was voluntarily given. The court advised the jury what voluntariness means, and then set forth various factors for the jury to use in determining whether the statement was voluntarily given. One factor listed by the court was whether appellant was read his *Miranda* rights. In its explanation of that factor, the court made the following statement:

> In this case, it is undisputed that Corporal Gibson didn't advise [appellant] of these *Miranda* rights. He didn't tell him those things. Okay, that's a factor that you may consider, it says here.

> But it is important for you to understand when a police officer has to advise a person of his or her *Miranda* rights, and I am going to tell you that.

> Now, when I say I am going to tell you that, I am going to tell you in about three sentences. There have been hundreds of thousands, hundreds of thousands of cases written on this subject, but I am going to make it as simple for you as I can. I don't know if it's hundreds of thousands, but lots and lots.

> A person who is in the involuntary custody of the police is entitled to be advised of his or her *Miranda* warnings before they make a statement. Now, you've heard a lot about whether somebody was under arrest or not under arrest. Obviously, if you are under arrest, you are involuntarily in the custody of the police, and obviously you are required to have your *Miranda* warnings before your statement can be received into evidence.

---

4. This is the statement, discussed in section III of this opinion, which appellant gave to the police prior to his arrest.

Now, in this case, Officer Gibson, my recollection of the testimony—yours will control. These are some of the facts as I remember them—says, no, we didn't place this young man under arrest. We asked him if he would voluntarily accompany us to the station, and he voluntarily accompanied us.

We told him he was free to go at any time. He knew he was free to go any time, so he was not involuntarily in our company—or in our custody, excuse me—and therefore we do not have to give him his *Miranda* warnings.

If, in fact, he freely and voluntarily went with the police, if he wasn't in their custody involuntarily, they don't have to advise him of his *Miranda* rights. It's only if, in fact, he is involuntarily in their custody that they have to advise him of his *Miranda* rights.

Appellant claims that the circuit court's commentary on Officer Gibson's testimony constituted reversible error because it invaded the jury's fact-finding role. We disagree.

Rule 4–325(d) provides that, "[i]n instructing the jury, the court may refer to or summarize the evidence in order to present clearly the issues to be decided." Subsection (d) also provides that when the court does refer to or summarize the evidence, it "shall instruct the jury that it is the sole judge of the facts, the weight of the evidence, and the credibility of the witnesses."

In spite of the fact that the court may refer to or summarize evidence in its instructions, it must be careful not to comment on the weight of the evidence. This is so for two reasons. First, the jury is the sole judge of the facts of a case. *See Dykes v. State,* 319 Md. 206, 224–25, 571 A.2d 1251 (1990). Second, when a judge comments on the weight of the evidence, jurors are likely, because of the authoritativeness of the judges's position, to be influenced by him or her. *See Fagan v. State,* 110 Md.App. 228, 244, 676 A.2d 1009 (1996) ("[I]f a judge makes a statement which shows his or her opinion of a question of fact which the jury is to pass on, it is very apt to make an impression on some, if not all, of the

jurors ....") (quoting *Gore v. State,* 309 Md. 203, 213, 522 A.2d 1338 (1987)). Thus, when a judge makes a comment on the weight of the evidence, he or she cannot help but invade the fact-finding function which is supposed to belong exclusively to the jury. For this reason, " 'it is generally improper for a trial judge to show his or her opinion of those matters upon which the jury will eventually pass.' " *Fagan,* 110 Md.App. at 243, 676 A.2d 1009 (quoting *Gore,* 309 Md. at 214, 522 A.2d 1338).

In the case *sub judice,* the court simply summarized Officer Gibson's testimony with respect to whether appellant was in custody. Before summarizing Officer Gibson's testimony as allowed by Rule 4–325(d), however, the trial judge disclosed to the jury that its recollection of the testimony was controlling with respect to the voluntariness issue. The court instructed:

> "Now, in this case, Officer Gibson, my recollection of the testimony—*yours will control.* These are some of the facts as I remember them—says, no, we didn't place this young man under arrest. We asked him if he would voluntarily accompany us to the station, and he voluntarily accompanied us."

Such an instruction complies with the judge's duty from Rule 4–325(d) to inform the jury that it decides the facts and weighs the credibility of witnesses.

The trial judge's next statement, "These are some of the facts as I remember them," was a harmless comment leading into his summary of the evidence. The statement was not, as appellant contends, an invasion of the jury's fact-finding role. Furthermore, the court's reference to "some of the facts" was not intended to be an attestation to the veracity of Officer Gibson's testimony, nor was it an indication that the court believed the version of the events propounded by the State. To the contrary, the trial judge warned the jury that his recapitulation of the relevant testimony was from his memory, even though it would be their memories and recollections that would control. We are convinced beyond a reason-

able doubt that the court's comments in no way influenced the verdict.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**