974 A.2d 991

Thomas SMITH

v.

STATE of Maryland.

No. 2764, Sept.Term, 2007.

Court of Special Appeals of Maryland.

July 6, 2009.

500

502

Brian L. Zavin (Nancy S. Forster, Public Defender on the brief), Baltimore, for appellant.

Jeremy M. McCoy (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, for appellee.

Panel: SALMON, GRAEFF, and CHARLES E. MOYLAN, JR. (retired, specially assigned), JJ.

MOYLAN, J.

The problem is a simple one of proper conceptualization. At a surface level, the tactical issue in the case is that of whether *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), applies to the investigative event on which the appellant focuses. At the strategic level, the issue is that

of whether the Fifth Amendment privilege against compelled self-incrimination applies to that investigative event. If, for any reason, that strategic protection should not apply, then any tactical minutiae generated by *Miranda v. Arizona* would be beside the point. The subordination of the tactical conceptualization to the strategic conceptualization is our central theme.

The appellant, Thomas Smith, was convicted by a Carroll County jury, presided over by Judge Michael M. Galloway, of the possession of crack cocaine with the intent to distribute it. Upon this appeal, he raises the single contention that at a pretrial suppression hearing, Judge Galloway erroneously failed to suppress an inculpatory admission which, he claims, was elicited in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

### The Suppression Hearing

Our only concern, therefore, is with the suppression hearing and the evidence produced thereat. Judge Galloway conducted the hearing on March 15, 2007. It was established that at approximately 7:45 P.M. on June 7, 2006, four members of the Westminster City Police Department executed a search and seizure warrant at 16 Pennsylvania Avenue, Apartment 13, in Westminster. The apartment belonged to the appellant. Recovered from the appellant's chest of drawers in the appellant's bedroom was a plastic bag containing approximately one ounce of crack cocaine.

At the suppression hearing, the appellant attacked, secondarily, the validity of the search warrant. Judge Galloway ruled that the application for the warrant had, indeed, furnished Judge Luke Burns with a substantial basis for issuing the warrant. He accordingly denied the motion to suppress in that regard. The appellant no longer challenges that ruling.

The primary thrust of the appellant's challenge was, and is, to the admissibility of his exclamation, "It is all mine," repeated twice, as one of the searching officers walked from the bedroom of the apartment into the living room holding the

plastic bag of crack cocaine. The appellant's argument, in a nutshell, is that that inculpatory exclamation was made in response to the functional equivalent of interrogation, to which he had been subjected by the police without the benefit of his constitutionally required *Miranda* advisements.

## The Harmless Error We Need Not Consider

To keep the whole issue in realistic perspective, the exclamation, "It is all mine," amounted to little more than a self-evident truism. The apartment that was searched belonged to the appellant and was apparently not shared by anyone else. The bedroom that was searched belonged to the appellant. The chest of drawers that was searched belonged to the appellant and contained his clothing. The drawer that contained the crack cocaine was a small drawer which the cocaine shared with the appellant's socks. Corporal Scott Peter, the lead investigator who recovered the cocaine, took the possessory connection for granted: "I didn't ask him if it was his. It was in a sock drawer. I just assumed that it was his." It is unnecessary, however, to speculate about the hypothetical possibility of harmless error in view of our firm conclusion that there was no error in the first place. If no error exists, there would be only a vacuum to assess in terms of either harmlessness or harmfulness. Forgoing that "*arguendo* exercise," we will confine ourselves to the merits of the *Miranda* issue.

## The Appellant's Exclamation and Its Antecedents

At the suppression hearing, only two witnesses were called upon to testify. One was Corporal Scott Peter, the lead investigator in the case and the officer who had applied for and been issued the search and seizure warrant that was being executed. The other witness was Corporal James Pullen, of the Criminal Investigation Bureau of the Westminster City Police Department, who was assisting Corporal Peter in executing the warrant. We find it curious, and not without some significance, that the appellant himself did not testify. His sole appellate contention is that the combination of his deten-

tion and some ambiguous police conduct that he claims was the functional equivalent of interrogation somehow compelled him to exclaim the words, "It is all mine." In terms of why he spoke and of what made him speak, he was the only person who truly knew the answer, but he chose to say nothing. The notion that the appellant chose to take all the blame on himself in order to exonerate one of the other arrestees, who may have been his girlfriend, simply has no testimonial predicate. The appellant might have told us about such matters, but he did not.[1]

On the preliminary issue of suppressing his inculpatory exclamation, he was, of course, free to testify with the full protection of use immunity so that nothing he said at the pretrial hearing could later have been used against him on the merits of guilt or innocence. *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

It was Corporal Pullen who, a few minutes into the search, discovered in the appellant's bedroom the plastic bag containing a quarter of an ounce of what turned out to be cocaine. Corporal Pullen alerted Corporal Peter to his discovery. Corporal Peter, in turn, observed the suspected cocaine in the bureau drawer and seized it. As he then carried the bag of cocaine from the bedroom into the living room, he showed it to the appellant and then announced to the other officers that all four persons who were then being detained would be arrested. The appellant blurted out, "It is all mine." When asked about the timing of the appellant's blurt, Corporal Peter testified:

Seconds, probably—from the time it took me to walk by him and say that everyone is being arrested, less than probably ten seconds.

---

1. In *State v. Conover*, 312 Md. 33, 44, 537 A.2d 1167 (1988), as well, the ostensible motivation for an incriminating "blurt" was introduced not by the testimony of the defendant but only by argument of counsel.
    *"Respondent did not testify at the suppression hearing, and no direct evidence was offered in support of this argument.* The trial judge was under no obligation to accept the inferences for which Respondent's counsel argued."
    (Emphasis supplied):

It is appellant's contention that his exclamation, "It is all mine," was his compelled response to the combination of 1) custody and 2) the functional equivalent of interrogation.

## A Testimonial Privilege

To get a firm grip on what we are dealing with, we need to zoom in, progressively, first on the testimonial privilege that is constitutionally enshrined in the Fifth Amendment, then on the Supreme Court case of *Miranda v. Arizona* that implements that privilege in certain new and relatively unfamiliar circumstances, then more narrowly on the very threshold of *Miranda's* applicability, and finally on the respective sub-elements of applicability, to wit, custody and interrogation.

■■ The Fifth Amendment privilege is part of a broader evidentiary family, the "testimonial privileges." Other members of the family may include (it varies from state to state) the husband-wife privilege, the attorney-client privilege, the doctor-patient privilege, the priest-penitent privilege, the news reporter-source privilege. The privilege against compelled self-incrimination, however, is the only privilege that enjoys constitutional status. As with all testimonial privileges, however, the privilege against self-incrimination is a limited exemption from a basic obligation. The fundamental societal rule is that in the pursuit of full disclosure in the courtroom, in civil and criminal trials alike, "the public is entitled to everyone's knowledge." *Kastigar v. United States,* 406 U.S. 441, 443–44, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). Certain overriding considerations, however, with most privileges as a matter of policy, sometimes justify an exemption from that testimonial obligation. Because such exemptions are, as a general rule, disfavored,[2] however, the burden is upon a party assert-

---

2. 8 *Wigmore on Evidence* (McNaughton ed. rev.1961), § 2192, p. 70, observed:

[T]here is a general duty to give what testimony one is capable of giving and ... any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule. *McCormick on Evidence* (4th ed. by J.W. Strong, 1992), p. 275, states:

ing a testimonial privilege 1) expressly to claim it, *Rogers v. United States,* 340 U.S. 367, 370–74, 71 S.Ct. 438, 95 L.Ed. 344 (1951), and 2) to demonstrate an entitlement to it, *Hoffman v. United States,* 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118(1951).

### Required Elements of the Fifth Amendment Privilege

■ The Fifth Amendment privilege consists of a spare fifteen words: "no person shall be compelled in any criminal case to be a witness against himself." Those fifteen words, however, spell out six separate elements. For the privilege to be available, each of its six constituent elements must be established:

1. no person [3]

2. shall be compelled [the compulsion element] [4]

3. in any criminal case [5]

---

Since privileges operate to deny litigants access to every man's evidence, the courts have generally construed them no more broadly than necessary to accomplish their basic purposes.

Joseph F. Murphy, Jr., *Maryland Evidence Handbook* (3d ed.1999), § 900, p. 356, has similarly observed:

It is obvious that evidence excluded on grounds of privilege increases the danger of an incorrect verdict. The privilege laws are therefore given a narrow, strict construction.

Lynn McLain, *Maryland Evidence*, (2001 ed.), § 501.1, p. 9, writes to the same effect:

[G]enerally, privileges are strictly construed because they exclude relevant, reliable evidence.

*See also United States v. Balsys,* 524 U.S. 666, 118 S.Ct. 2218, 141 L.Ed.2d 575 (1998); *Branzburg v. Hayes,* 408 U.S. 665, 690 n. 29, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); *Kastigar v. United States,* 406 U.S. 441, 443, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

**3.** *McPhaul v. United States,* 364 U.S. 372, 380, 81 S.Ct. 138, 5 L.Ed.2d 136(1960); *Hale v. Henkel,* 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906).

**4.** *Andresen v. Maryland,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976); *Fisher v. United States,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976); *Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966).

**5.** *United States v. Ward,* 448 U.S. 242, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980); *Counselman v. Hitchcock,* 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892).

4.  to be a witness [the testimonial element] [6]

5.  against [7]

6.  himself; [8]

Historically, the applicability of these six elements—and, therefore, of the privilege itself—was something that was hammered out in the courtroom or some other formal legal setting. The privilege has been an integral part of our legal culture for 218 years, since the ratification of the Bill of Rights on December 15, 1791, and a massive body of caselaw has been built up around it. It was only in 1966, when *Miranda v. Arizona* moved the privilege from the courthouse ten blocks up the street to the station house and from the trial ten weeks backward in time to the initial investigation, that additional rules for assessing both applicability and satisfaction became necessary. The *Miranda* opinion itself, 384 U.S. at 461, 86 S.Ct. 1602, explained why the privilege against compelled self-incrimination, to be effective, necessarily had to apply to the station house as well as to the courthouse.

> We are satisfied that *all the principles embodied in the privilege apply to informal compulsion exerted by law-enforcement officers during in-custody questioning. An individual* swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the techniques of persuasion described above *cannot be otherwise than under compulsion to speak.* As a practical matter, *the compulsion to speak in the isolated setting of the police station may well be greater than in courts or*

---

**6.**  *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *Holt v. United States,* 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021 (1910).

**7.**  *Kastigar v. United States,* 406 U.S. 441, 453, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

**8.**  *Braswell v. United States,* 487 U.S. 99, 108 S.Ct. 2284, 101 L.Ed.2d 98 (1988); *Bellis v. United States,* 417 U.S. 85, 94 S.Ct. 2179, 40 L.Ed.2d 678 (1974).

*other official investigations,* where there are often impartial observers to guard against intimidation or trickery.

(Emphasis supplied).

In the station house, as opposed to the courthouse, the normal tools and procedures for implementing the privilege are generally not available.[9] Alternative forms of implementation were necessary.

> Today, then, there can be no doubt that *the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons* in all settings in which their freedom of action is curtailed in any significant way *from being compelled to incriminate themselves.* We have concluded that without proper safeguards the process of *incustody interrogation* of persons suspected or accused of crime *contains inherently compelling pressures which work* to undermine the individual's will to resist and *to compel him to speak where he would not otherwise do so freely. In order to combat these pressures* and to permit a full opportunity to exercise the privilege against self-incrimination, *the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored.*

384 U.S. at 467, 86 S.Ct. 1602 (emphasis supplied).

Accordingly, *Miranda* devised its prophylactic catechism to implement the privilege against compelled self-incrimination in that new and unfamiliar setting, where lawyers and judges were not traditionally and routinely present.

---

**9.** The sweeping impact of the relocation was described by *Reynolds v. State,* 88 Md.App. 197, 216, 594 A.2d 609 (1991):

> The testimonial privilege, long a familiar fixture in the courthouse, had been massively moved out to the station house. Whereas the implementation of that privilege had been a comfortable tradition in the courthouse, with lawyers and judges and clerks and 200 years of precedent habituated to their implementing roles, implementation in the strange, new setting was problematic. Without the familiar cast of implementing personnel on hand at the station house, it fell to the lot of *Miranda* to perform their role in the new and untraditional locale.

## Putting *Miranda* In Perspective

As will be more fully explored *infra,* the critical issue in this case is not the satisfaction or violation of *Miranda v. Arizona.* It is, rather, the threshold applicability of *Miranda v. Arizona.* When *Miranda* is not applicable, there is, by definition, no way in which *Miranda* can be either satisfied or violated. The whole *Miranda* package is, if inapplicable, utterly immaterial. To get a firm handle on the threshold issue of Miranda's applicability or coverage, it is important to reidentify precisely what *Miranda* is and what *Miranda* is not.

## *Miranda* Is a Set of Prophylactic or Implementing Rules

The giving of the so-called *Miranda* warnings or Miranda advisements or Miranda catechism by the police to a suspect is not, and never has been, a constitutional requirement. Although *Miranda v. Arizona* was necessarily held by *Dickerson v. United States,* 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000), to be of constitutional status (lest *Miranda* no longer be enforceable against the states),[10] *Miranda's* cele-

---

**10.** The *Dickerson* case caught the Supreme Court on the horns of an embarrassing dilemma. After nearly four decades of declaring consistently that the *Miranda* catechism was simply a set of prophylactic rules designed to implement the Fifth Amendment privilege but was not itself constitutional, the *Dickerson* case challenged the Court with its glaring self-contradiction, "If *Miranda* is not constitutional, how can you impose it on the states or preclude the Congress from overruling it?" In an *ipse dixit* opinion that appalled the academic community, the Supreme Court somehow straddled the fence. *Miranda v. Arizona* is constitutional in a jurisdictional sense and will continue to be applied to the states. Its individual parts, however, remain as sub-constitutional implementing or prophylactic rules. "It is constitutional when we need it to be, but is otherwise sub-constitutional." The Great Oz has spoken.

Paul G. Cassell, *The Paths Not Taken: The Supreme Court's Failures in Dickerson,* 99 Mich. L.Rev. 898, 903 (2001), is indicative of the opinion's academic reception: "[The holding] leaves the Miranda doctrine incoherent." Yale Kamisar, *Miranda Thirty Five Years Later: A Close Look at the Majority and Dissenting Opinions in Dickerson,* 33 Ariz. St. L.J. 387, 390 (2001), added that the opinion is "so sparse and so cryptic that it is difficult, if not impossible, to discuss it without engaging in a good deal of speculation."

brated catechism of warnings or advisements has been consistently held by the Supreme Court to be merely a set of prophylactic rules designed to implement the undergirding Fifth Amendment privilege. In *Michigan v. Tucker*, 417 U.S. 433, 445–46, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974), Justice Rehnquist wrote for the Court in distinguishing between the Fifth Amendment privilege itself and *Miranda's* implementing rules:

> *[T]he police conduct* at issue here did not abridge respondent's constitutional privilege against compulsory self-incrimination, but *departed only from the prophylactic standards* later laid down by this Court in *Miranda to safeguard that privilege.*

Susan R. Klein, *Identifying and Reformulating Prophylactic Rules, Safe Harbors, and Incidental Rights in Constitutional Criminal Procedure*, 99 Mich. L.Rev. 1030, 1071 (2001), minced no words:

This opinion was, in a word, terrible. The Court, when squarely faced with the issue of whether the four *Miranda* warnings were required by the federal constitution, not only refused to answer coherently, but breached its duty to provide a justification for *Miranda* or *Dickerson* and squandered an opportunity to rationalize contradictory case law regarding *Miranda* exceptions.

Richard Fallon, *Judiciary Legitimacy and the Unwritten Constitution: A Comment on Miranda and Dickerson*, 45 N.Y. L. Sch. L.Rev. 119 (2000–2001), defended the Supreme Court's strategic ambiguity:

[T]he Court is composed of practical lawyers, not philosophers. As practical lawyers, the Justices know that the best rhetorical strategy for maintaining at least a shallow acceptance of their role among the public—one of the component variables in the calculus of legitimacy—is sometimes to be less than wholly forthcoming.

Andrew Jezic, Frank Molony, and William Nolan, *Maryland Law of Confessions* (2005 ed.), 192–93, captured the likely impact of the *Dickerson* decision:

While the *Dickerson* Court put an end to this campaign to dismantle *Miranda* via the federal statute from 1968, the Court reiterated that the specific *Miranda* warnings themselves are not mandated by the Constitution, and implied that new laws, passed by either Congress or state legislatures, which more adequately safeguard the Fifth Amendment privilege, might be acceptable.

The compound question, "Is *Miranda* constitutional or is it subconstitutional?" thus yields the wonderfully reassuring answer, "Yes." This Court made an in-depth examination of both the background leading up to the *Dickerson* case and the *Dickerson* decision itself in *Ashford v. State*, 147 Md.App. 1, 35–46, 807 A.2d 732 (2002).

(Emphasis supplied). In *New York v. Quarles,* 467 U.S. 649, 654, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984), the Supreme Court again characterized the junior varsity status of the *Miranda* warnings.

> *The prophylactic Miranda warnings* therefore *are not themselves rights protected by the Constitution* but are instead *measures to insure that the right* against compulsory self-incrimination is *protected.*

(Emphasis supplied). In *Oregon v. Elstad,* 470 U.S. 298, 309, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), Justice O'Connor distinguished the mere implementing rules from the undergirding constitutional privilege.

> If errors are made by law enforcement officers in administering the prophylactic *Miranda* procedures, they should not breed the same irremediable consequence as police infringement of the Fifth Amendment itself.

(Emphasis supplied).

In *Connecticut v. Barrett,* 479 U.S. 523, 528, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987), the Supreme Court similarly stated:

> It remains clear that *this prohibition on further questioning—is not itself required by the Fifth Amendment's* prohibition on coerced confessions, *but is* instead *justified only by reference to its prophylactic purpose.*

(Emphasis supplied).

*Davis v. United States,* 512 U.S. 452, 457, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), observed specifically with respect to *Miranda's* right to counsel:

> The right to counsel established in *Miranda* was *one of a* "*series of recommended 'procedural safeguards'* ... *that were not themselves rights protected by the Constitution* but were instead measures to insure that the right against compulsory self-incrimination was protected."

(Emphasis supplied). *See also Montejo v. Louisiana,* 556 U.S. ——, 129 S.Ct. 2079, 173 L.Ed.2d 955 (2009); *Withrow v. Williams,* 507 U.S. 680, 690–91, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993) ("*Miranda's* safeguards are not constitutional in

character."); *McNeil v. Wisconsin,* 501 U.S. 171, 176–77, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991); *Michigan v. Harvey,* 494 U.S. 344, 350–51, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990); *Duckworth v. Eagan,* 492 U.S. 195, 203, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989); *Solem v. Stumes,* 465 U.S. 638, 644–45, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984).

Maryland has punctiliously followed the Supreme Court's lead. Speaking through Chief Judge Orth in *Ryon v. State,* 29 Md.App. 62, 67, 349 A.2d 393 (1975), this Court early on recognized that the *Miranda* warnings were designed to implement the Fifth Amendment privilege.

[T]he Court in *Miranda* "recognized that *these procedural safeguards* were not themselves rights protected by the Constitution but *were* instead *measures to insure that the right against compulsory self-incrimination was protected.*"

(Emphasis supplied). In *State v. Ryon,* 278 Md. 302, 363 A.2d 243 (1976), the Court of Appeals did not simply affirm our decision but expressly adopted the opinion of this Court in *Ryon v. State* as its own.

In *In Re Appeal No. 245,* 29 Md.App. 131, 149, 349 A.2d 434 (1975), Chief Judge Orth again wrote for this Court:

In both *Harris* and *Tucker,* the misconduct of the police violated only *the prophylactic rules developed by Miranda* to *protect the right against self-incrimination.*

(Emphasis supplied).

In *Ashford v. State,* 147 Md.App. 1, 30, 807 A.2d 732 (2002), we made reference to *"Miranda's* quasi-constitutional status" and to "the ambiguous and indeterminant status of *Miranda v. Arizona* generally." *See also Williams v. State,* 342 Md. 724, 761, 679 A.2d 1106 (1996); *Vines v. State,* 285 Md. 369, 379 n. 9, 402 A.2d 900 (1979) (*"Miranda* impressed *procedural safeguards* on the traditional test of voluntariness by way of warnings to be given."); *State v. Kidd,* 281 Md. 32, 36–37, 375 A.2d 1105 (1977); *Thomas v. State,* 128 Md.App. 274, 295, 737 A.2d 622 (1999); *Brashear v. State,* 90 Md.App. 709, 721–22, 603 A.2d 901 (1992); *Reynolds v. State,* 88 Md.App. 197, 208, 594 A.2d 609 (1991) ("The so-called *Miranda* catechism is

rather a judicially devised implementing device, specifically designed to safeguard the Fifth Amendment privilege against compelled self-incrimination."); *Kidd v. State,* 33 Md.App. 445, 449–55, 366 A.2d 761 (1976); *Bartram v. State,* 33 Md.App. 115, 160–67, 364 A.2d 1119 (1976), *aff'd,* 280 Md. 616, 374 A.2d 1144 (1977) ("[B]oth this Court and the Court of Appeals have recognized this pivotal difference between a constitutional violation itself which will trigger the 'fruit of the poisonous tree' doctrine and a 'mere *Miranda'* violation which will not trigger that doctrine.").

## Sweep of an Implementing Rule Can Be No Broader Than That of the Thing Being Implemented

To avoid overdosing on *Miranda,* it is important to keep constantly in mind the identity between the mere implementing rule and the undergirding constitutional protection being implemented. To understand the coverage of an implementing rule, both its reach and its limits, one must necessarily understand the coverage of the thing that the implementing rule implements. It is the latter that controls the former. As this Court explained in *Reynolds v. State,* 88 Md.App. 197, 208, 594 A.2d 609 (1991):

> The scope of an implementing rule can be no broader than the scope of the undergirding constitutional protection being implemented.

The point of departure for any inquiry into the coverage of *Miranda* is the Fifth Amendment to the Constitution of the United States. That amendment is a broad umbrella. One of its five provisions is the privilege against compelled self-incrimination. The identity between the implementing rule and the thing implemented was squarely stated by *United States v. Mandujano,* 425 U.S. 564, 579, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976):

> *Miranda expressly rested on the privilege against compulsory self-incrimination;* the prescribed warnings sought to

negate the "compulsion" thought to be inherent in police station interrogation.

(Emphasis supplied).

Even when deeply immersed in *Miranda v. Arizona* in microcosm, therefore, one must never forget the enveloping macrocosm of the privilege against compelled self-incrimination. The view from the mountain top sometimes gives us insight not readily perceptible from the ground.

### *Miranda* and the Element of Compulsion

■ Of the six required elements that constitute the privilege against compelled self-incrimination, the one that is identified with *Miranda v. Arizona* is the element of compulsion. It is, indeed, a vital part of the label of the privilege itself. There is no such thing as a general constitutional privilege against self-incrimination. *Cummings v. State*, 27 Md.App. 361, 363–64, 341 A.2d 294 (1975). There is no such thing as a constitutional privilege against inadvertent self-incrimination or against stupid self-incrimination. *Ciriago v. State*, 57 Md. App. 563, 574, 471 A.2d 320 (1984). The constitutional privilege guards against only one form of self-incrimination: COMPELLED self-incrimination. *Oregon v. Elstad*, 470 U.S. 298, 306–07, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) ("The Fifth Amendment prohibits use by the prosecution in its case in chief only of compelled testimony."). As this Court pointed out in *Jones v. State*, 132 Md.App. 657, 668, 753 A.2d 587 (2000), "Without the presumption of compulsion, the Supreme Court lacked any jurisdictional basis for imposing the *Miranda* catechism on the states."

■ Ordinarily, a person claiming the privilege against self-incrimination would be required to satisfy the court with respect to each of the constituent elements, including that of compulsion. *Hoffman v. United States*, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951). In the unusual context of custodial interrogation, however, *Miranda* has given a criminal defendant the benefit of a bright-line short-cut to the proof of the compulsion element. **CUSTODIAL INTERROGATION IS**

**PRESUMPTIVELY COMPELLING.** If the defendant can prove the two sub-elements of 1) custody and 2) interrogation, the defendant has, for all intents and purposes, *ipso facto* established the necessary element of compulsion without any further proof being required. This Court discussed this bright line short cut to the proof of compulsion in *Reynolds v. State*, 88 Md.App. 197, 209, 594 A.2d 609 (1991), adopted by the Court of Appeals as the opinion of that court, *Reynolds v. State*, 327 Md. 494, 511, 610 A.2d 782 (1992):

> To determine when the threat of governmental compulsion is at work in an investigative setting, *Miranda* announced a bright line formula that *the combination of custody and interrogation will be deemed to be presumptively coercive.* It is, therefore, *custodial interrogation* that *gives rise to the presumption of compulsion* and brings into play the therapeutic, implementing rule of *Miranda. Absent the combination of both custody and interrogation, there is no presumption of compulsion and there is, therefore, no call for Miranda's implementing countermeasures.*

(Emphasis supplied).

In the bright line short cut to the finding of compulsion, "Custodial interrogations is presumptively compelling," the adverb "presumptively" serves a very critical function. The thing being searched for is still the element of compulsion. "Custody" and "interrogation" are not ends in themselves but are simply convenient trail markers that we follow in tracking down compulsion, trail markers that work most (but not necessarily all) of the time. *Illinois v. Perkins*, 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990), was a case in point. A defendant, who was in prison, gave incriminating statements to an undercover policeman who was posing as a fellow prisoner. The defense was that the undercover officers had not given the prisoner *Miranda* warnings even though both custody and interrogation were literally present. Justice Kennedy's opinion kept the focus on the underlying actuality of compulsion.

The warning mandated by *Miranda* was meant to preserve the privilege during "*incommunicado interrogation of indi-*

*viduals in a police-dominated atmosphere." That atmosphere is said to generate "inherently compelling pressures* which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." "Fidelity to *the doctrine announced in Miranda requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated." Berkemer v. McCarty* (1984):

496 U.S. at 296, 110 S.Ct. 2394 (emphasis supplied).

■ The merely presumptive (as opposed to absolute) identity between compulsion and custodial interrogation has significance in both directions. Just as *Illinois v. Perkins* is a case in which there was no compulsion even in the presence of custody and interrogation, such Maryland cases as *In re Joshua David C.,* 116 Md.App. 580, 698 A.2d 1155 (1997) (involving a 10–year–old juvenile) and *Bond v. State,* 142 Md.App. 219, 788 A.2d 705 (2002) (eerily similar to *Orozco v. Texas,* 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969)) may involve such extreme circumstances that there was compulsion even in the absence of custody (or at least in the absence of formal arrest as the most common hallmark of custody). The focus remains on compulsion itself. Thus, both the presumption that custodial interrogation is coercive and the implicit counter presumption that only custodial interrogation is coercive are, albeit true most of the time, subject to exceptions.

■ The other elements of the privilege generally not being in issue, the establishment of compulsion establishes the privilege. Once the Fifth Amendment privilege is applicable, then (but only then) are the implementing rules of *Miranda* applicable. In short, a criminal defendant claiming that *Miranda* is applicable (and that it, therefore, must be satisfied) must establish the two sub-elements of

1. CUSTODY, and

2. INTERROGATION

as those two terms of art have been fleshed out by the extensive body of *Miranda* caselaw. In *Reynolds,* 88 Md.App. at 208, 594 A.2d 609, we discussed this symbiotic relationship

between the Fifth Amendment privilege and its implementing rules:

> When the threat of compulsion and the antidotal Fifth Amendment privilege are involved in an extrajudicial police-citizen confrontation, *Miranda's* implementing rule is *ipso facto* involved as well. *Absent that involvement of the Fifth Amendment privilege,* based upon the inherent threat of compulsion, *Miranda is self-evidently inapplicable.*

(Emphasis supplied).

### the Burden of Proving the Risk of Compulsion

As with all testimonial privileges, the burden is upon the party claiming a privilege against compelled self-incrimination to prove entitlement to such a privilege. All of the constituent elements of the privilege must, therefore, be established, including that of compulsion. Whether one seeks to prove the risk of compulsion via the roundabout totality of the circumstances route or via *Miranda's* bright line short cut of custody plus interrogation, the allocation of the burden of proof remains the same. Via the short cut, the criminal defendant aspiring to *Miranda* benefits must prove *both* 1) custody *and* 2) interrogation. Whenever *Miranda* is raised as an issue in a criminal case, two very distinct questions present themselves:

**1. IS *MIRANDA APPLICABLE?***

(Do not go on to Question # 2 unless the answer to Question # 1 is, "Yes.")

**2. IF SO, WAS *MIRANDA* SATISFIED?**

The passage from Question # 1 to Question # 2 is also vitally important because a critical switch occurs in the allocation of the burden of proof. If *Miranda* is, indeed, applicable and the merits of a confession are before the court, the burden properly is allocated to the State to show that the *Miranda* requirements were satisfied (and that the Fifth Amendment privilege was thereby vindicated). This is so because the burden of proving the admissibility of a challenged confession is always on the State. *State v. Tolbert,* 381

Md. 539, 557, 850 A.2d 1192 (2004) ("In Maryland, when the State intends to use a confession . . . *given by the defendant to the police during custodial interrogation,* the prosecution must, upon proper challenge, establish . . . that the statement satisfies the mandate of *Miranda v. Arizona.*") (emphasis supplied).

At the threshold of showing the applicability of the *Miranda* requirements, however, the burden is on the defendant to show that applicability. This is the same shift in the allocation of the burden of proof as that which is made between 1) showing the applicability of the Fourth Amendment and 2) showing the satisfaction of the Fourth Amendment. The burden has always been allocated to a defendant to show the threshold applicability of the Fourth Amendment, to show, for example, the coverage of the place, state action, that the defendant had standing to object, etc. *Rakas v. Illinois,* 439 U.S. 128, 130 n. 1, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *Rawlings v. Kentucky,* 448 U.S. 98, 104, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *Burks v. State,* 96 Md.App. 173, 195, 624 A.2d 1257, *cert. denied,* 332 Md. 381, 631 A.2d 451 (1993) ("The burden of showing Fourth Amendment coverage is, of course, upon the appellant."); *Fitzgerald v. State,* 153 Md.App. 601, 662–63, 837 A.2d 989 (2003), *aff'd,* 384 Md. 484, 864 A.2d 1006 (2004). If and when the Fourth Amendment is determined to be applicable, on the other hand, the burden of proof then shifts to the State to show that the Fourth Amendment was satisfied, either by showing the existence of a judicially issued warrant or reasonable justification for a warrantless search.

## The Trigger of Custodial Interrogation

What the appellant must prove in this case is custodial interrogation. By way of repetitive refrain, *Miranda* drummed home its message that the need for its prophylactic catechism would be triggered by the fact of custodial interrogation.

Our holding will be spelled out with some specificity in the pages which follow but briefly stated it is this: the prosecution may not use statements, whether exculpatory or inculpatory, *stemming from custodial interrogation of the defendant* unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.

384 Md. at 444, 863 A.2d 976 (emphasis supplied). The Supreme Court went on, 384 U.S. at 445, 86 S.Ct. 1602:

The constitutional issue we decide in each of these cases is the admissibility of statements obtained from *a defendant questioned while in custody* or otherwise deprived of his freedom of action in any significant way.

(Emphasis supplied). The Court stressed again the triggering mechanism.

An understanding of the nature and setting of this *in-custody interrogation* is essential to our decisions today.

*Id.* (emphasis supplied). The Supreme Court emphasized the psychological dangers associated with custodial interrogation.

Again we stress that the modern practice of *in-custody interrogation* is psychologically rather than physically oriented.

384 U.S. at 448, 86 S.Ct. 1602 (emphasis supplied).

The drum beat continued as to the corrosive effect of custodial interrogation on the will to resist.

Even without employing brutality, the "third degree" or the specific stratagems described above, the very fact of *custodial interrogation exacts a heavy toll* on individual liberty and trades on the weakness of individuals.

384 U.S. at 455–56, 86 S.Ct. 1602 (emphasis supplied). A confession obtained through custodial interrogation cannot be deemed to be voluntary.

Unless adequate protective devices are employed to dispel *the compulsion inherent in custodial surroundings,* no statement obtained from the defendant can truly be the product of his free choice.

384 U.S. at 458, 86 S.Ct. 1602 (emphasis supplied). Custodial interrogation is incompatible with the Fifth Amendment privilege.

The question in these cases is whether the privilege is fully applicable during a period of *custodial interrogation.* 384 U.S. at 460–61, 86 S.Ct. 1602 (emphasis supplied).

It was clear that the inherent evil of custodial interrogation was the thing that the prophylactic rules of *Miranda* were designed to guard against.

> *An individual swept* from familiar surroundings *into police custody,* surrounded by antagonistic forces, *and subjected to the techniques of persuasion described above* cannot be otherwise than under compulsion to speak. As a practical matter, *the compulsion to speak in the isolated setting of the police station* may well be greater than in courts or other official investigations, where there are often impartial observers to guard against intimidation or trickery.

384 U.S. at 461, 86 S.Ct. 1602 (emphasis supplied). What then of the custodial interrogation in this case?

## The Issues Before Us

The appellant frames too narrowly what he perceives to be the issue before us as exclusively that of "interrogation." He relies on the fact that the State has already "conceded" that the sub-element of "custody" was established. We perceive, however, the appellant's proper argument to be that, as he stood in the living room of his Westminster apartment on the evening of June 7, 2006, he was in a position to claim the Fifth Amendment privilege against compelled self-incrimination and that he was, therefore, entitled to *Miranda's* implementing rules that protect that privilege. We understand the State's position to be that the privilege was not available to the defendant because of the lack of the element of compulsion and that the prophylactic protection of *Miranda* was, therefore, inapplicable to his situation.

The entitlement of a criminal defendant to claim the Fifth Amendment privilege generally and the establishment of

the constituent element of compulsion specifically are ultimate constitutional facts with respect to which we are enjoined to make our own independent *de novo* judgment, without regard to any ostensible concession. *Thompson v. Keohane*, 516 U.S. 99, 112–13, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995); *McAvoy v. State*, 314 Md. 509, 514–15, 551 A.2d 875 (1989); *Ashe v. State*, 125 Md.App. 537, 549, 726 A.2d 786 (1999); *Bond v. State*, 142 Md.App. 219, 227, 788 A.2d 705 (2002); *Allen v. State*, 158 Md.App. 194, 229, 857 A.2d 101 (2004). Even under *Miranda's* bright line short cut—that custodial interrogation is presumptively compelling—the issue before us remains that of whether the element of compulsion was thus established. In assessing the element of compulsion, we will look for ourselves at both sub-elements of custody and interrogation. The factual background bearing on both sub-elements was fully developed at the suppression hearing.

The suppression hearing judge, to be sure, concluded that custody had been established, but we must make our own independent assessment in that regard. The fact that the State itself conceded that the appellant was in custody tells us only that the State failed to appreciate the significant doctrinal difference between a seizure of the person for Fourth Amendment purposes and custody as a necessary precondition for *Miranda's* very existence. *Jones v. State*, 132 Md.App. 657, 665–66, 753 A.2d 587 (2000).[11] As we examine the phenomenon of compulsion for ourselves, we will not be precluded from looking at either or both of its bright line sub-elements. What the State conceded to be custody was not, as a matter of law, Miranda custody, which is our only concern.

---

11. This Court made the distinction very clear, 132 Md.App. at 666, 753 A.2d 587:

The appellant, to be sure, had been seized within the contemplation of the Fourth Amendment and was not free to leave the scene. That was enough to engage the gears of the Fourth Amendment, but it was not enough to engage the gears of *Miranda v. Arizona*. As *Berkemer v. McCarty* (1984) made clear, every lawful detention within the contemplation of the Fourth Amendment is not *ipso facto* necessarily "custody" within the contemplation of *Miranda*.

The appellant, of course, would like to believe that the issue of custody is no longer on the table. He would like to rely on the finding of custody by the trial judge and the concession of custody by the State. He could then treat custody as an axiomatic abstraction, attributing to it, in the course of his argument, the most lurid characterizations of custody to be found in the caselaw. We will not, however, with the glib assurance of a Gertrude Stein, simply assume that custody is custody is custody. It is, rather, a phenomenon that fluctuates in severity and in coercive force.

Sometimes the assessment of custody can be hermetically sealed off from the assessment of interrogation. On other occasions, however, they blend imperceptively into each other. Prolonged custody is not the same factor in an equation that custody for a split second might be, yet the blanket assertion that "custody existed" makes no distinction between the two. In a case such as this in which one of the acts of the police that is alleged to have been the functional equivalent of interrogation occurred in the very split second that non-custody may have ripened into custody, the catalytic influence of custody is by no means a foregone conclusion. This case illustrates the value of thinking in terms of the Fifth Amendment privilege itself with its indivisible element of compulsion, rather than of thinking in terms of the mere implementing rule, which seems to fragment compulsion into airtight sub-compartments of custody and interrogation.

If the appellant allegedly succumbed to the functional equivalent of interrogation because of the debilitating pressures of custody, we would like to know whether the succumbing came after 45 minutes of custody or after only a nanosecond of custody. Neither the hearing judge's generic finding nor the State's ostensible concession helps us in that regard. We will not, therefore, be forestalled from taking a hard look for ourselves at the issue of custody in this case.

## What Precisely is *Miranda* Custody?

After pointing out generically the evils of "custodial interrogation," the *Miranda* opinion began to address the practical

problem of defining just what "custody" consisted of. What precise circumstances would pull the trigger for the whole *Miranda* enterprise?

> By *custodial* interrogation, we mean questioning initiated by law enforcement officers *after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.*

384 U.S. at 444, 86 S.Ct. 1602 (emphasis supplied).

That was, however, hardly an A+ effort. To define "custody" as a person's status "after a person has been taken into custody" is to define the word in terms of itself. The other prong of the disjunctive definition was to be "otherwise deprived of his freedom of action in any significant way." The phrase "in any significant way" is treacherously open-ended. Would being asked to come to the station house and then being questioned behind closed doors qualify? Would a traffic stop qualify? Would a *Terry* stop on the street, with or without an attendant frisk, qualify? It is hard to imagine a defense attorney who could not bring a client's most minor embarrassment or stress or discomfort within the purview of the phrase. The Ur-text obviously did not resolve all future doubt.[12] That, however, is one reason why appellate courts remain in business. Our understanding of *Miranda* custody would evolve only slowly over the course of several decades.

### What *Miranda* Itself Sought to Counteract

Because the *Miranda* opinion had so much else to do, it is understandable that it did not define "custody" more precisely. Rome was not built in a day. Although its passing and casual definition of "deprived of his freedom of action in any significant way" may have been hopelessly vague, *Miranda* nonetheless did detail in lurid page after lurid page the almost Inquisitorial police practices that impelled the extraordinary relief of the *Miranda* catechism.

---

**12.** As Judge Battaglia noted in *State v. Rucker*, 374 Md. 199, 208, 821 A.2d 439 (2003), "The *Miranda* opinion gave little guidance as to what is meant by 'custody.' "

There were four separate cases consolidated into the *Miranda* opinion. Chief Justice Warren described how "in each, the defendant was questioned . . . in a room in which he was cut off from the outside world." 384 U.S. at 445, 86 S.Ct. 1602. "They all thus share salient features—incommunicado interrogation of individuals in a police-dominated atmosphere." *Id.* "The difficulty in depicting what transpires at such interrogations stems from the fact that in this country they have largely taken place incommunicado." *Id.* "In a series of cases decided by this Court . . ., the police have resorted to physical brutality—beating, hanging, whipping—and to sustained and protracted questioning incommunicado in order to extort confessions." 384 U.S. at 446, 86 S.Ct. 1602. "Interrogation still takes place in privacy. Privacy results in secrecy and this in turn results in a gap in our knowledge as to what in fact goes on in the interrogation rooms." 384 U.S. at 448, 86 S.Ct. 1602.

For seven full pages in the United States Reports, 384 U.S. at 449–55, 86 S.Ct. 1602, the *Miranda* opinion then quoted from a wide assortment of police interrogation manuals about effective techniques to break down an arrestee's will to resist. All four *Miranda* defendants had been arrested and questioned in secret. "In other settings, these individuals might have exercised their constitutional rights. In the incommunicado police-dominated atmosphere, they succumbed." 384 U.S. at 456, 86 S.Ct. 1602. The type of problem that *Miranda* was designed to deal with was clear. "[G]iven this background, we concern ourselves primarily with this interrogation atmosphere and the evils it can bring." *Id.* "In each of the cases, the defendant was thrust into an unfamiliar atmosphere and run through menacing police interrogation procedures." 384 U.S. at 457, 86 S.Ct. 1602. "The current practice of incommunicado interrogation is at odds with one of our Nation's most cherished principles—that the individual may not be compelled to incriminate himself." 384 U.S. at 457–58, 86 S.Ct. 1602.

It was thus the very *raison d'etre* of *Miranda*, rather than its limp definition of "custody," that could be counted upon to

hold the concept of custody in reasonably tight rein in the years that immediately followed *Miranda*.

## The *Beckwith–Mathiason* Seedtime

What some now see as a clash between two different definitions of "custody" was no clash at all but simply the by-product of that gradual evolution of our understanding of *Miranda* custody. Twice in the first eleven years, the Supreme Court gave indications that it was going to hold a firmer rein on the concept of "custody" than its original vague definition might have presaged. *Beckwith v. United States*, 425 U.S. 341, 347, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976), made it clear that police focus on a suspect does not render an interview with that suspect a custodial one.

An interview with Government agents in a situation such as the one shown by this record simply does not present the elements which the *Miranda* Court found so inherently coercive as to require its holding. Although the "focus" of an investigation may indeed have been on Beckwith at the time of the interview in the sense that it was his tax liability which was under scrutiny, he hardly found himself in the custodial situation described by the *Miranda* Court as the basis for its holding.

The question of whether a police interrogation was custodial so as to engage the gears of *Miranda* arose in *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), a case in which a burglary suspect was asked to come to the station house where he was interrogated. The Supreme Court of Oregon reversed the conviction, holding that the interrogation was custodial and that the failure to give *Miranda* warnings was, therefore, fatal.

"We hold the interrogation took place in a 'coercive environment.' The parties were in the offices of the State Police; they were alone behind closed doors; the officer informed the defendant he was a suspect in a theft and the authorities had evidence incriminating him in the crime; and the defendant was a parolee under supervision. We are of the opinion that this evidence is not overcome by the

evidence that the defendant came to the office in response to a request and was told he was not under arrest ."
275 Or. 1, 549 P.2d 673, 675.

The Supreme Court of the United States reversed, holding that every coercive influence does not add up to *Miranda* custody.

> *Any interview of one suspected of a crime* by a police officer *will have coercive aspects to it,* simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. . But *police officers are not required to administer Miranda warnings to everyone whom they question.*

429 U.S. at 495, 97 S.Ct. 711 (emphasis supplied).

## Why *Miranda* Did Not Deal With Terry

To observe that *Miranda* in 1966 did not in any way deal with what we now call the *Terry*-level of lesser police-citizen encounters is a truism. *Terry v. Ohio* (1968) had not yet been decided and would not be decided for another two years. The very concept of less intrusive restraints on a citizen's freedom of movement, a subject that has become a major growth industry in the decades since *Terry*, had not yet dawned on the legal horizon. Forty-three years later, the distinction between formal arrest or its equivalent, on the one hand, and traffic stops and *Terry* stops, on the other hand, is our most prominent criterion for distinguishing *Miranda's* applicability from *Miranda's* inapplicability. If *Miranda's* language in 1966 did not adequately anticipate the problem by making fine distinctions then, it was because the problem, as a practical matter, did not yet realistically exist. There really was not that much to distinguish in 1966.

## The *Beheler–Berkemer* Reformulation

The quest for greater certainty as to the meaning of *Miranda* custody had to wait for 17 years after *Miranda's* promulgation for any significant movement forward. In *California v. Beheler,* 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d

1275 (1983), the Supreme Court reversed a holding by the California Court of Appeals that a thirty-minute questioning of a murder suspect at the station house was "custodial" for purposes of *Miranda* applicability.

> [W]e have explicitly recognized that *Miranda* warnings are not required "simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect."

463 U.S. at 1125, 103 S.Ct. 3517. In determining *Miranda* custody, the *Beheler* Court focused upon the fact of formal arrest or its equivalent. For the first time, the Supreme Court caselaw provided a more certain criterion.

> Although the circumstances of each case must certainly influence a determination of whether a suspect is "in custody" for purposes of receiving *Miranda* protection, *the ultimate inquiry is simply whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.*

*Id.* (emphasis supplied).

For the first time, therefore, greater certainty was possible in the assessment of when custody was present and when, therefore, *Miranda* applied. See Richard Williamson, *The Virtues (and Limits) of Shared Values: The Fourth Amendment and Miranda's Concept of Custody,* 1993 U. Ill. L.Rev. 379, 392 ("[T]he Court used the *Beheler* opinion as the vehicle for announcement of a more definite definition of *Miranda's* concept of custody."). *See also United States v. Rith,* 164 F.3d 1323, 1332 (10th Cir.1999) (The Supreme Court "clarified" the custody standard in *Beheler.*).

As a brief per curiam opinion, decided without benefit of oral argument. *Beheler* was, to be sure, a low profile case. Higher celebrity for the new criterion was assured one year later, however, with *Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). *Berkemer* provided, for the first time, what is now the most significant and most frequently litigated distinction in the law of *Miranda* custody. It is the distinction between non-custodial traffic stops and other

non-custodial *Terry* stops, on the one hand, and formal custodial arrest or its equivalent, on the other hand. *Berkemer* now precludes defendants' arguments, based on earlier and not yet refined definitions, that they were in *Miranda* custody simply because they were deprived of their freedom of movement or were not "free to leave." Those are not, if they ever were, the criteria of arrest or of *Miranda* custody, as this Court took pains to point out in *Carter v. State*, 143 Md.App. 670, 677, 795 A.2d 790 (2002):

> The appellant solemnly insists that he "was not free to leave." Of course, he wasn't. That's why this was a *Terry*-stop requiring the *Terry* level of Fourth Amendment justification. Had he been free to leave, this would have been a mere accosting and the Fourth Amendment would not even have been implicated. *Under Terry, a stopee's freedom of movement is most definitely restricted under the command of the law. If he attempts to leave* after being ordered, perhaps at gunpoint, to stop, *he may be forcibly restrained. Such consequences,* notwithstanding the appellant's urging to the contrary, *do not ipso facto transform a Terry-stop into an arrest.*

(Emphasis supplied).

In *Berkemer*, the defendant was initially stopped by a trooper of the Ohio State Highway Patrol for a traffic violation. In the course of that initial stop, there was, without benefit of *Miranda* warnings, a question asked by the trooper and an inculpatory answer given by the defendant.

> While still at the scene of the traffic stop, Williams asked respondent whether he had been using intoxicants. Respondent replied that "he had consumed two beers and had smoked several joints of marijuana a short time before."

468 U.S. at 423, 104 S.Ct. 3138. Of the several questions posed by the case, it was the second that concerns us here:

> Second, *does* the *roadside questioning* of a motorist detained pursuant to a traffic stop constitute custodial interro-

gation for the purposes of the doctrine enunciated in *Miranda?*

*Id.* (emphasis supplied).

On the issue of whether such roadside questioning in the course of a traffic stop should be considered custodial interrogation so as to engage the gears of *Miranda,* the defendant relied upon the broad language of the *Miranda* opinion itself.

> Respondent urges that it should, on the ground that *Miranda* by its terms applies whenever "a person has been taken into custody *or otherwise deprived of his freedom of action in any significant way.*"

468 U.S. at 435, 104 S.Ct. 3138 (emphasis supplied).

The Supreme Court acknowledged that a traffic stop does, indeed, curtail the driver's "freedom of action."

> It must be acknowledged at the outset that *a traffic stop significantly curtails the "freedom of action"* of the driver and the passengers, if any, of the detained vehicle. Under the law of most States, *it is a crime either to ignore a policeman's signal to stop* one's car or, once having stopped, to drive away without permission.

468 U.S. at 436, 104 S.Ct. 3138 (emphasis supplied). That, however, does not constitute *Miranda* custody. Looking beyond the "talismanic power" of a casual phrase to the undergirding privilege against compelled self-incrimination itself, the Supreme Court then concluded that this was not remotely the type of coercive environment that had generated the *Miranda* decision itself.

> However, *we decline to accord talismanic power to the phrase in the Miranda* opinion emphasized by respondent. *Fidelity to the doctrine announced in Miranda requires that it be enforced* strictly, but *only in those types of situations in which the concerns that powered the decision are implicated.* Thus, we must decide whether a traffic stop exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights.

468 U.S. at 437, 104 S.Ct. 3138 (emphasis supplied). Significantly, the Court analogized a traffic stop to a *Terry* stop and contrasted both with a formal arrest.

[T]he usual stop is more analogous to a so-called *"Terry* stop," than to a formal arrest.

468 U.S. at 439, 104 S.Ct. 3138. After further noting the non-coercive similarities between *Terry* stops and traffic stops, the Supreme Court concluded:

The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not "in custody" for the purposes of *Miranda.*

. . .

. . . It is settled that the safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a "degree associated with formal arrest."

468 U.S. at 440, 104 S.Ct. 3138. *See also Pennsylvania v. Bruder,* 488 U.S. 9, 109 S.Ct. 205, 102 L.Ed.2d 172. 10–11, 488 U.S. 9, 109 S.Ct. 205, 102 L.Ed.2d 172 (1988).

In *Reynolds v. State,* 88 Md.App. 197, 210, 594 A.2d 609 (1991), this Court summarized *Berkemer's* contrasting of a *Terry* stop or traffic stop with formal arrest.

The *Berkemer* opinion reminded us that *the custodial setting dealt with by Miranda*—a setting severe enough to give rise to a presumption of compulsion—*was one wherein a suspect was held "incommunicado" and "in a police dominated atmosphere."* It then went on to point out that *even a legally authorized detention or seizure of the person in the context of a traffic stop or even a Terry stop did not amount to custody within the contemplation of Miranda.*

(Emphasis supplied). We offered our assessment of what *Miranda* custody ordinarily involves.

*"Custody" ordinarily contemplates that a suspect will be under arrest,* frequently in a jailhouse or station house setting.

88 Md.App. at 209, 594 A.2d 609 (emphasis supplied). Significantly, that part of our opinion was expressly adopted by the Court of Appeals in its *Reynolds v. State,* 327 Md. 494, 511, 610 A.2d 782 (1992), as its own opinion.

> We ... adopt the well-reasoned analysis of the Court of Special Appeals, which held that *Miranda* warnings were unnecessary because there was no custodial interrogation. 88 Md.App. at 207–13, 594 A.2d 609.

In *State v. Rucker,* 374 Md. 199, 209–10, 821 A.2d 439 (2003), the Court of Appeals expressly recognized the *Beheler–Berkemer* refinement of the term "custody."

> Since *Miranda* ..., the Supreme Court has refined what it meant by "custody." In *California v. Beheler* ..., the Supreme Court stated that, "[a]lthough the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving *Miranda* protection, *the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."* ...
> [I]n *Berkemer v. McCarty,* ... the Court declared, "It is settled that the *safeguards prescribed by Miranda become applicable as soon as a suspects freedom of action is curtailed to a 'degree associated with formal arrest.'*"

(Emphasis supplied).

In *Rucker,* 374 Md. at 212, 821 A.2d 439, Judge Battaglia held that the Terry stop in that case was not a formal arrest and that *Miranda,* therefore, did not apply.

> In the present case, *the question, then, is whether there was a formal arrest or restraint of freedom of movement of the degree associated with a formal arrest* in the situation before us. The State contends Rucker was not in custody, and in support of that contention, argues that Rucker was detained pursuant to a routine *Terry* stop, and that the stop, contrary to the decision of the Court of Special Appeals, did not develop into a "*de facto*" arrest....
> For the reasons discussed hereinafter, we conclude that under the circumstances of this case, *the stop of Rucker was*

*a brief investigatory stop* and had remained so when Rucker told the police that he had cocaine. *Rucker was not in custody for purposes of Miranda because he was not restrained to a degree associated with a formal arrest.* Accordingly, *Miranda warnings were not required* before the police asked Rucker whether he had anything illegal.

(Emphasis supplied). *See also McAvoy v. State,* 314 Md. 509, 515–17, 551 A.2d 875 (1989); *Allen v. State,* 158 Md.App. 194, 229–30, 857 A.2d 101 (2004); *Conboy v. State,* 155 Md.App. 353, 372, 843 A.2d 216 (2004) ("When Trooper Grinnan stopped the taxi, he executed a lawful *Terry* stop to investigate appellant's presence and unusual behavior at the accident scene. That investigatory stop has not evolved into a formal arrest or a 'restraint on freedom of movement of the degree associated with a formal arrest' before appellant makes the statement at issue."); *Craig v. State,* 148 Md.App. 670, 687, 814 A.2d 41 (2002) ("Here, the seizure only rose to the level of a *Terry* stop, investigatory in nature, and brief in duration. Craig was not in custody and his *Miranda* warnings need not have been given at that juncture."); *Jones v. State,* 132 Md.App. 657, 672, 753 A.2d 587 (2000) ("Officer DeVito subjected the appellant to a *Terry* stop and brief detention while a potential eyewitness was brought to the scene.... We hold that such brief and quasi-public questioning of the appellant by Officer DeVito was not 'custodial interrogation' within the contemplation of *Miranda v. Arizona* ").

*Stansbury v. California,* 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994), reaffirmed *Beheler's* focus on "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." The *Stansbury* case also made it very clear that the custody issue hinges objectively on what a police officer actually does vis-a-vis a suspect and not on what subjectively may be on the mind of either the officer or the suspect.

Our decisions make clear that *the initial determination of custody depends on the objective circumstances of the inter-*

*rogation, not on the subjective* views harbored *by either the interrogating officers or the person being questions.*

511 U.S. at 323, 114 S.Ct. 1526 (emphasis supplied).

## Inadvertent Flashbacks

In the years since the *Beheler–Berkemer* reformulation of the custody standard, there have been, to be sure, a few Maryland cases that have reverted to the language of the earlier standard rather than using the current language of arrest or arrest equivalent. Those were generally, however, short analyses that unquestionably reached a proper result by the later standard but which inadvertently quoted from *Miranda* itself rather than from the *Beheler–Berkemer* refinement of *Miranda.* Unless such opinions expressly purported to be choosing between arguably conflicting standards, however, undue significance should not be given to what were probably mere casual or unconscious linguistic lapses, particularly where those lapses did not influence the final decision.

Readers must be careful to guard against seeing a doctrinal clash where none really exists. If some cases quote from an earlier and looser definition of "custody" whereas others quote from a later and tighter definition, that variation may portend nothing more significant than which of two equally supportive precedents a law clerk first chanced upon. We must not impute clashes to opinions that are unaware that they are clashing.

### *Terry*–Level Detention Under *Michigan v. Summers*

All of the parties in this case rushed to judgment on the issue of custody. Everyone blithely assumed that the appellant was in custody, but the evidence did not support that assumption. Every form of detention at the hands of the police, even if accompanied by handcuffing, is not *ipso facto* custody within the contemplation of *Miranda.* That a detainee may not feel "free to leave," moreover, is not a talisman for determining *Miranda's* applicability.

The police team that executed the search warrant on the appellant's apartment consisted of four officers. When the police arrived at 7:45 p.m., four individuals were present on the second-story balcony that Apartment 13 shares with several other apartments on that floor. One was the appellant. The others were Kathy MacGruder, Heather Myers, and Alan MacGruder. All four persons were placed in flex cuffs. They were not, however, arrested until later, after the search had revealed the presence in the apartment of contraband cocaine. At the outset of the search, the appellant asked permission to come into the living room of the apartment, where he sat on a sofa. The other three remained on the balcony. After the cocaine was discovered, all four individuals were placed under arrest.

All parties seemed to have assumed that, as the appellant and his three guests were sitting or standing in flex cuffs and under police guard, they were in custody for *Miranda* purposes. Their status during the course of the search, however, did not constitute *Miranda* custody. As of the moment when the appellant (and the other three as well) were placed under formal arrest, he was, we conclude, technically in custody within the contemplation of *Miranda*. Until that moment, however, the appellant (and the other three as well) were, we also hold, being subjected only to a *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), level of temporary, on-the-scene detention as authorized by *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981). Being detained at the scene of a search pursuant to *Michigan v. Summers* while the search is in progress is simply not, absent some extraordinary extra features not remotely present in this case, incommunicado confinement in a police-dominated atmosphere. Such detention, the Supreme Court explained in *Summers*, 452 U.S. at 697–98, 101 S.Ct. 2587, is significantly less oppressive than custodial arrest.

> *[S]ome seizures significantly less intrusive than an arrest* have withstood scrutiny under the reasonableness standard embodied in the Fourth Amendment. In these cases *the intrusion on the citizen's privacy "was so much less severe"*

*than that involved in a traditional arrest* that "the oppos-
ing interests in crime prevention and detection and in the
police officer's safety" could support the seizure as reason-
able.

(Emphasis supplied).

Maryland is fully in line with characterizing such *Terry*-
level detentions pursuant to *Michigan v. Summers* as far less
intrusive or oppressive than custodial arrest. *Williamson v.
State,* 398 Md. 489, 921 A.2d 221 (2007); *Brown v. State,* 397
Md. 89, 100, 916 A.2d 245 (2007) ("A warrant to search for
contraband founded on probable cause implicitly carries with
it the limited authority to detain [as a *Terry*-level detention]
the occupants of the premises while a proper search is con-
ducted."); *Cotton v. State,* 386 Md. 249, 872 A.2d 87 (2005)
(Defendant was detained, handcuffed, and placed under guard
for 15–20 minutes pursuant to *Michigan v. Summers,* This
was held to be a Terry detention and not a *de facto* arrest.);
*Fromm v. State,* 96 Md.App. 249, 255–56, 624 A.2d 1296 (1993)
("In detaining appellant and transporting him the short dis-
tance to his apartment, the police officer promoted at least two
legitimate law enforcement interests set forth in *Michigan v.
Summers*—preventing flight and facilitating the orderly com-
pletion of the search.").

We hasten to add that the use of flex cuffs on the appellant
and the other three individuals being detained did not trans-
form a *Terry stop into an arrest. In Trott v. State,* 138
Md.App. 89, 118, 770 A.2d 1045 (2001), Judge (now Chief
Judge) Krauser observed for this Court:

> Appellant contends that even if the stop was justified, his
> handcuffing by Officer Middleton transformed that stop into
> an "arrest." That arrest was illegal, appellant claims, be-
> cause the officer did not have, at that time, probable cause
> to arrest him.
>
> We disagree for three reasons. First, *the handcuffing of
> appellant was justifiable as a protective and flight preven-
> tive measure pursuant to a lawful stop and did not neces-
> sarily transform that stop into an arrest.*

(Emphasis supplied). Judge Krauser's opinion then surveyed ten federal cases and eight state cases in support of his conclusion that "handcuffing does not necessarily transform a 'stop' into an 'arrest.'" *Id. See also Farrow v. State,* 68 Md.App. 519. 525. 514 A.2d 35 (1986).

In *In re David S.,* 367 Md. 523, 539–40, 789 A.2d 607 (2002), Judge Raker wrote for the Court of Appeals in holding that a "hard take down," including handcuffing, did not transform a *Terry* stop into an arrest.

> We hold that the stop was a legitimate *Terry* stop, not tantamount to an arrest. Several police officers conducted a "hard take down" of respondent. *See Lee,* 311 Md. 642, 537 A.2d 235. *The officers, with their weapons drawn, forced respondent to the ground and placed him in handcuffs.* This conduct was not unreasonable because the officers reasonably could have suspected that respondent posed a threat to their safety. Considering the totality of the circumstances, as they appeared to the officers at the time, in order to maintain their safety, *handcuffing respondent and placing him on the ground for a brief time was reasonable and did not convert the investigatory stop into an arrest* under the Fourth Amendment

(Emphasis supplied).

### The Custody In This Case

Although the time interval between the two events was fleeting, the appellant argues that his exclamation, "It is all mine," was his unconstitutionally compelled response to two closely related, but distinct, police actions, which he further alleges were each the functional equivalent of interrogation. The first occurred as Corporal Peters walked into the living room and showed him, as he passed by, the bag containing cocaine recovered from the appellant's bedroom bureau. The second action came seconds thereafter as Corporal Peters made the general announcement that all four persons who were then being detained were going to be arrested.

Although the timing was close, the actual showing of the evidence to the appellant came before he was formally arrested and while he was still being held, with the others, pursuant to *Terry*-level detention under the authority of *Michigan v. Summers*. Even if we were to assume, purely *arguendo*, that the showing of the evidence were the functional equivalent of interrogation, that hypothetical interrogation would not have been custodial and no obligation, therefore, to cushion it with *Miranda* advisements would have preceded it.

Whether the second event, by contrast, qualifies as a custodial event is a fascinating question of first impression. It is truly a question worthy of a Platonic dialogue. The five or six word announcement, "We are going to arrest everybody," was over and done within several seconds. If that announcement were, *arguendo*, the functional equivalent of interrogation, it was an interrogation that, from start to finish, lasted no more than a moment. That same small fraction of a minute, however, was also the catalytic moment wherein the appellant's *Terry*-level detention ripened into formal arrest. Was the hypothetical interrogation, therefore, custodial? It's a fascinating question. Although it is hard to picture the erosive influence of custodial interrogation working that fast on the will to resist, an announcement such as, "Unless you speak, you will be shot," could, we suppose, have an immediate compelling effect. In any event, the metaphysical possibilities of instantaneous compulsion are such that it at least behooves us to go on and examine the closely related issue of "What is Miranda interrogation?"

### What Precisely Is *Miranda* Interrogation?

In its simplest form, interrogation is an easy concept to grasp. It is a police officer asking a question of a suspect about the suspect's involvement in a crime. At the edges, however, the concept can get a little blurry. It is not always an orchestrated set of alternating questions and answers. Every actual question, moreover, is not necessarily followed by a question mark. It has been the more shadowy concept of

the functional equivalent of interrogation that *Miranda* has had to come to grips with in terms of its applicability.

Fourteen years after *Miranda*, the Supreme Court first took up this problem in *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). As a suspect in a series of armed robberies of taxicab drivers, Innis was arrested on the streets of Providence at approximately 4:30 A.M. He was advised of his *Miranda* rights and invoked his right to an attorney. The issue in the case was whether the Providence police violated that right by then engaging in interrogation as two officers transported him to the station house in a patrol car.

There was no question about custody. Innis had not only been formally arrested, but he was locked in the rear of what was described as a "caged wagon" with a wire screen mesh between him and two officers in the front seat. The two officers, within the full hearing of Innis, engaged in conversation about the missing shotgun and the danger that, if found, it might pose to the handicapped children in a school located nearby. As one officer observed that it "would be too bad if one of these little girls would pick up the gun and kill herself," Innis interjected that he would take the officers to where he had hidden the gun.

Following Innis's conviction for kidnapping, robbery, and murder, the Rhode Island Supreme Court held that the shotgun should have been suppressed as the fruit of an unconstitutional interrogation. It held that the officers' conversation had been the functional equivalent of interrogation, designed to elicit a response from Innis.

The Supreme Court of the United States "granted certiorari to address for the first time the meaning of 'interrogation' under *Miranda v. Arizona.*" 446 U.S. at 297, 100 S.Ct. 1682. Reversing the Supreme Court of Rhode Island, it held that what *Miranda* is designed to guard against is not only direct interrogation but its functional equivalent as well.

[T]he term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant

to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

446 U.S. at 301, 100 S.Ct. 1682.

In holding that this was not the functional equivalent of interrogation, the Supreme Court explained:

[I]t cannot be fairly concluded that the respondent was subjected to the "functional equivalent" of questioning. It cannot be said, in short, that Patrolmen Gleckman and McKenna should have known that their conversation was reasonably likely to elicit an incriminating response from the respondent. *There is nothing in the record to suggest that the officers were aware that the respondent was peculiarly susceptible to an appeal to his conscience* concerning the safety of handicapped children.

446 U.S. at 302, 100 S.Ct. 1682 (emphasis supplied).

What the Supreme Court there said about the police having no reason to anticipate a suspect's sudden burst of altruism has pertinence for the present case as well.

The case thus boils down to *whether*, in the context of a brief conversation, *the officers should have known that the respondent would suddenly be moved to make a self-incriminating response*. Given the fact that the entire conversation appears to have consisted of no more than a few offhand remarks, we cannot say that the officers should have known that it was reasonably likely that Innis would so respond. *This is not a case where the police carried on a lengthy harangue in the presence of the suspect*. Nor does the record support the respondent's contention that, under the circumstances, the officers' comments were particularly "evocative." It is our view, therefore, that the respondent was not subjected by the police to *words or actions that the police should have known were reasonably likely to elicit an incriminating response from him*.

446 U.S. at 303, 100 S.Ct. 1682 (emphasis supplied).

Since *Innis*, the Supreme Court has decided but one other case dealing with the question of what is *Miranda* interrogation (or the functional equivalent thereof). *Arizona v. Mauro*,

481 U.S. 520, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987), however, does not really contribute much to our general understanding. It seems to have been ill-advised in the first place to try to squeeze into the analytic framework of Miranda interrogation the police behavior under scrutiny. It would seem to have been more a question of the limits of police eavesdropping on a conservation between husband and wife.

Mauro was at the station house, under arrest for the murder of his son. He was given his *Miranda* warnings and he invoked his right to counsel. All interrogation stopped. His wife, also being held at the station house, expressed her desire to speak with her husband. After informing both husband and wife that such a conversation would only be permitted if a police officer were in the room with them and if the conversation was recorded on tape, the police acquiesced in the decision of both husband and wife to speak with each other. Several of Mauro's comments were used against him in rebutting his insanity defense.

The Arizona Supreme Court reversed the conviction, 149 Ariz. 24, 716 P.2d 393 (1986), holding that the permitting of the husband-wife conversation had been a forbidden functional equivalent of interrogation under *Rhode Island v. Innis*. The Supreme Court of the United States reversed. In holding that there had been no functional equivalent of interrogation, the Supreme Court first observed that there was no reason to believe that the police either 1) intended for the husband-wife conversation to elicit incriminatory responses or 2) had reason to believe that it would produce such incriminating responses.

> Nor is it suggested—or supported by any evidence—that Sergeant Allen's decision to allow Mauro's wife to see him was the kind of psychological ploy that properly could be treated as the functional equivalent of interrogation.
>
> *There is no evidence that the officers sent Mrs. Mauro in to see her husband for the purpose of eliciting incriminating statements.*

481 U.S. at 527–28, 107 S.Ct. 1931 (emphasis supplied).

The Court also focused on what a defendant, such as Mauro, might feel in terms of whether he was subjected to coercion.

*We doubt that a suspect,* told by officers that his wife will be allowed to speak to him, *would feel that he was being coerced to incriminate himself in any way.*

481 U.S. at 528, 107 S.Ct. 1931 (emphasis supplied).

■ Whereas simple interrogation itself can be easily identified as a reviewing court checks off that single element of its analysis, more ambiguous police behavior that might be deemed the functional equivalent of interrogation is so open-ended and amorphous that a reviewing court must look outside the box of literal "interrogation" itself to the larger picture of whether the police behavior involved the sort of coercive thing that the *Miranda* catechism was designed to forfend, the sort of thing that actually implicates the compulsion element of the privilege against compelled self-incrimination.

Mauro was not subjected to compelling influences, psychological ploys, or direct questioning. Thus, his volunteered statements cannot properly be considered the result of police interrogation.

In deciding whether particular police conduct is interrogation, *we must remember the purpose behind our decisions in Miranda and Edwards*[*v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)]: preventing government officials from using *the coercive nature of confinement* to extract confessions that would not be given in an unrestrained environment. The government actions in this case do not implicate this purpose in anyway.

481 U.S. at 529–30, 107 S.Ct. 1931 (emphasis supplied).

Whereas simple interrogation is only a single factor in the larger equation, the functional equivalent of interrogation, by contrast, may sometimes involve a reconsideration of the entire equation. In this regard, the analysis of "interrogation," on the one hand, and of the "functional equivalent of interrogation," on the other hand, cannot be handled in exactly the same way. The existence of simple interrogation can generally be determined in its own comfortable little vacuum. The existence of the functional equivalent of interrogation, by contrast, frequently laps over into a consideration of the

custody issue and, sometimes, into the more open-ended consideration of underlying compulsion itself. Instead of being a single, easily determined bright-line clue on the road to finding compulsion, it has a way of becoming synonymous with the entire compulsion issue itself.

In *Vines v. State*, 285 Md. 369, 402 A.2d 900 (1979), Judge Orth for the Court of Appeals anticipated both Rhode *Island v. Innis* and *Arizona v. Mauro*. Vines was charged, as was the appellant here, with the possession of narcotics with intent to distribute. Vines was arrested at his residence during the execution of a search and seizure warrant. He was taken to the police station and, in an interview room, was advised of his *Miranda* rights. He invoked his right to silence. He subsequently, however, made several damaging admissions. At a suppression hearing he challenged, as does the appellant here, the admissibility of those admissions. He claimed that those admissions were unconstitutional in that, in violation of *Miranda*, he had been subjected to the functional equivalent of interrogation.

Vines, in contrast to the appellant here, was in undisputed custody well before the ostensible interrogation took place. Vines, unlike the appellant here, had been transported to the station house and into an interview room before the questioned interrogation took place. Vines remained in the interview room for approximately half an hour. Vines was then taken to the roll call room, where he was shown the contraband that had been taken from his residence during the search and seizure. Carefully laid out on a table were thirteen tinfoil packets of various sizes, some opened and some closed, each of which contained white powder with brown specks. Vines was then handed a copy of the warrant, containing an inventory of all of the evidence seized. Unlike the appellant here, Vines was directly addressed by the police as they told him that all of the evidence on display was what had been recovered from his residence in the course of the search. He looked at the display on the table for a couple of seconds, sat down in a chair, and "made an outburst," stating that "it

was his stuff" and asking "what he could do to help himself out." 285 Md. at 369, 402 A.2d 900.

Just as Corporal Peter in this case stated that his purpose was to show the appellant what had been recovered in the search, the police in *Vines* also said that and much more.

> The police indicated that *the immediate reason for taking Vines to the roll call room was "to show him what was taken out of his premises* and give him the papers," that is the warrant with the inventory of the articles seized. *The main purpose, however, was to get him to turn State's evidence,* "to obtain his help in getting information relative to who was over top of him." *When Snipes was asked whether another purpose was to have Vines make an incriminating statement, he responded: "I would say it was a thought, but that was not the main purpose."*

285 Md. at 369, 402 A.2d 900 (emphasis supplied).

The question posed by the Court of Appeals was whether "the viewing by Vines of the evidence in the roll call room ... constituted an 'interrogation' within the meaning of *Miranda.*" *Id.* The trial judge ruled that there had not been an interrogation. On direct appeal, this Court held that there had not been an interrogation. 40 Md.App. 658, 394 A.2d 809 (1978). Without a dissenting vote, the Court of Appeals held that the display of evidence to Vines did not constitute an interrogation within the contemplation of *Miranda.*

> When *the officer* gave Vines the copy of the warrant containing the inventory, he *merely made the true statement that this was what was recovered from Vines' house during the raid.* We find it plain in the circumstances that *the giving of the inventory to Vines* in compliance with our rules of procedure, coupled with the simple factual statement by the police, *was not tantamount to an "interrogation" within the meaning of Miranda. The display of some of the property taken does not compel a contrary result* on the facts of this case.... In other words, *there was no*

*"interrogation" here to which the Miranda code was applicable.*

285 Md. at 378, 402 A.2d 900 (emphasis supplied).

Judge Orth then went on to cite, with approval, a series of cases in which this Court had similarly rejected claims that various instances of police behavior had constituted the functional equivalent of interrogation. *Humphrey v. State,* 39 Md.App. 484, 386 A.2d 1238, *cert. denied,* 283 Md. 733 (1978) (detective's statement that police had "just found the gun"); *Dent v. State,* 33 Md.App. 547, 365 A.2d 57 (1976) (after arrest defendant complained of leg injury; detective examined the leg and asked how it had been hurt); *Fellows v. State,* 13 Md.App. 206, 283 A.2d 1 (1971), *cert. denied,* 264 Md. 747 (1972) (review of evidence including statement of third party incriminating defendant); *Howell v. State,* 5 Md.App. 337, 247 A.2d 291 (1968). *cert. denied,* 253 Md. 734 (1969) (told of third party's statement incriminating defendant).

In *State v. Conover,* 312 Md. 33, 537 A.2d 1167 (1988), an arrested defendant invoked his *Miranda*-based right to counsel. The issue before the Court of Appeals was whether the police then engaged in a forbidden functional equivalent of interrogation when they read the defendant a statement of charges and handed him copies of both the charging document and the application on which it was based, suggesting that he "read them, look at them, if you have any questions, ask them." The defendant gave an inculpatory response. 312 Md. at 37, 537 A.2d 1167.

The Court of Appeals agreed that the "determination of whether there was a Fifth Amendment violation in this case turns on the question of whether there was an interrogation." 312 Md. at 38, 537 A.2d 1167. Judge McAuliffe's opinion, 312 Md. at 40, 537 A.2d 1167, stressed the basic principle that should guide any assessment of the interrogation question. "[I]t is helpful to keep in mind the reasons for the existence of the rule—the evils addressed by *Miranda* and the goals of the safeguards there established." The Court of Appeals had no

difficulty in holding that the Fifth Amendment privilege had not been violated.

> The police acted reasonably and lawfully, and *the Respondent was not subjected to compelling influences, psychological ploys, or direct questioning.* His volunteered statement was properly admitted.

312 Md. at 45, 537 A.2d 1167 (emphasis supplied).

Just as Corporal Peter in this case simply announced to the other officers, in the hearing of the appellant, that everyone was going to be arrested, the police in *Williams v. State,* 342 Md. 724, 679 A.2d 1106 (1996), simply announced to the defendant there that he was being charged with murder. In rejecting the notion that such innocuous comments might engage the gears of *Miranda* interrogation, Judge Chasanow wrote for the Court:

> These comments simply advised Williams that *police had evidence they believed established Williams's guilt in a double homicide, and* as a result *he was being charged with murder.* We cannot conclude that the trial judge erred in finding that these innocuous comments were not reasonably likely to elicit an incriminating response from Williams. *See United States v. Payne,* 954 F.2d 199, 202 (4th Cir.) *("[T]he Innis definition of interrogation is not so broad as* to capture within *Miranda's reach all declaratory statements by police officers concerning the nature of the charges* against the suspect and the evidence relating to those charges.").

342 Md. at 761, 679 A.2d 1106 (emphasis supplied).

In *Conboy v. State,* 155 Md.App. 353, 843 A.2d 216 (2004), the issue was that of who was the owner of a badly damaged van, littered with alcohol beverages, that had been in an accident. The police seized a key from the appellant and determined that it fit the ignition system of the van. When the officer confronted the defendant with the knowledge that the key fit, the defendant made a damaging admission. The issue was whether the police behavior amounted to interroga-

tion. Judge (now Chief Judge) Krauser held for this Court that there had been no interrogation.

*[W]e now turn to the question of whether that statement was "the product" of interrogation, either "express questioning or its functional equivalent." While appellant sat on the ground as instructed, the trooper walked over to the van and placed the key in the ignition. When the key proved to be the van's ignition key, the trooper walked back, stating "it's funny, the key fits." That statement was merely an observation made without inviting a response.*

155 Md.App. at 373, 843 A.2d 216 (emphasis supplied).

In *Prioleau v. State,* 179 Md.App. 19, 943 A.2d 696, *cert. denied,* 405 Md. 290, 950 A.2d 828 (2008), the critical words of the police were, "What's up, Maurice?" The defendant responded with an incriminating blurt. The defendant claimed the functional equivalent of interrogation. Judge Barbera responded:

[A]ppellant's statement that followed on the heels of Det. Stach's greeting was not the product of interrogation but rather was volunteered by appellant. It *was a classic "blurt," to which the protections of Miranda do not apply.*

179 Md.App. at 30, 943 A.2d 696 (emphasis supplied).

This Court's analysis focused on whether the police should have known that their words were likely to elicit an incriminating response.

Det. Stach's testimony indicates that he did not intend the words he spoke to appellant to be anything other than a greeting. He testified that "What's up, Maurice" was "not a question on anything that has to do with illegal activity." ... That fact is significant because "the police surely cannot be held accountable for the unforeseeable results of their words or actions," and *"the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response."*

179 Md.App. at 29, 943 A.2d 696 (emphasis supplied). *See also White v. State,* 374 Md. 232, 821 A.2d 459 (2003). For an

analysis of blurts generally, see *Ciriago v. State,* 57 Md.App. 563, 471 A.2d 320 (1984).

### The Interrogation Question in This Case

The only police action that might qualify as the functional equivalent of interrogation was Corporal Peter's announcement, not to the appellant but to the other members of the police team, that everyone was going to be arrested. Corporal Peter, of course, could have done no less. The police cannot ordinarily arrest someone without communicating to the arrestee, by word or deed, that he is being arrested. It is not a pantomime. We hold that such an announcement in this case was not something either calculated to or likely to provoke an incriminating response. It does not qualify as *Miranda* interrogation.

With respect to whatever altruistic surge prompted the appellant's blurt, we can only applaud. As the Supreme Court noted in *United States v. Washington,* 431 U.S. 181, 187, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977):

[F]ar from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable.

### Conclusion

In a burst of spontaneous gallantry toward three assembled friends, the appellant incriminated himself with an acknowledgment of possession, "It's all mine." By no means, however, had he been compelled so to fall upon his sword. The credit was all his. His privilege against compelled self-incrimination not having been in jeopardy, there was nothing for *Miranda v. Arizona* to have implemented. Miranda, therefore, did not apply.

Let it be carefully noted that in this lengthy discussion of *Miranda v. Arizona,* we have not said a word about the merits of *Miranda.* We have uttered not a syllable about *Miranda's* being satisfied or *Miranda's* being violated, because where it does not apply, *Miranda* can be neither satisfied nor violated.

We have confined ourselves scrupulously to the threshold of *Miranda's* applicability.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**